**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

**SILVIE POMICTER and**
**LAST CHANCE FOR ANIMALS** :
:
**Plaintiffs,** :
**v.** : **3:16-CV-00632-RDM**
: **(JUDGE MARIANI)**
**LUZERNE COUNTY CONVENTION** :
**CENTER AUTHORITY and** :
**SMG** :
:
**Defendants.** :

**MEMORANDUM OPINION**

## I. INTRODUCTION AND PROCEDURAL HISTORY

On April 15, 2016, Plaintiffs Silvie Pomicter and Last Chance For Animals ("Plaintiffs") filed a verified complaint against Defendants Luzerne Country Convention Center Authority (the "Authority") and SMG ("SMG" and, together with the Authority, "Defendants"). (Doc. 1). Plaintiffs also moved for preliminary injunctive relief. (Doc. 3). Plaintiffs allege that Defendants policies and practices violate the First and Fourteenth Amendments and seek both declaratory and injunctive relief prohibiting the Defendants from enforcing its policy of confining all leafletting and protesting to barricaded designated areas on the concrete and sidewalk outside of the Mohegan Sun Arena (the "Arena").

The Court held a telephonic conference on April 20, 2016, and on April 25, 2016 the Court held an evidentiary hearing on Plaintiffs' motion for a preliminary injunction. For the reasons that follow, the Court will grant Plaintiffs' Motion for Preliminary Injunction.

## II. FINDINGS OF FACT

### A. The Plaintiffs

Plaintiff Silvie Pomicter ("Pomicter") is an individual residing in Lackawanna County Pennsylvania and has been animal rights activist for over thirty years. (Decl. of Silvie Pomicter In Support of Plaintiffs' Motion For Preliminary Injunction ("Pomicter Decl.") at ¶ 2). Pomicter and a group of approximately 20 animal rights activists seek to protest outside the Arena. Specifically, Plaintiffs seek to stand outside the Arena with signs and distribute literature to patrons attending the Ringling Brothers Barnum & Bailey Circus, which will be holding several shows at the Arena from April 28, 2016 through May 1, 2016. The literature includes coloring books for children and flyers about circus animals. Apr. 25, 2016 Preliminary Injunction Hearing Tr. ("Hr'g Tr.") at 5:7-25; *see also* (Exs. P-1, P-2).

Ms. Pomicter does not create the literature she distributes. Rather, she obtains the literature free of charge from People for the Ethical Treatment of Animals, also known as "PETA," a large animal rights organization. (Hr'g Tr. at 6:11-19). Ms. Pomicter uses Facebook, e-mail, and the telephone to organize animal rights activists to attend protests, including protests at the Arena. (*Id.* at 6:25-7:7). Ms. Pomicter has protested at the Arena in the past and was confined to a barricaded area located in the parking lot outside the Arena. (*Id.* at 7:8-10); *see also* (Pomicter Decl. at ¶ 3).

Plaintiff Last Chance for Animals ("LCA") is a non-profit organization dedicated to eliminating animal exploitation through education, investigations, legislation, and media

attention. (Verified Compl. at ¶ 3). LCA is organized in California with an address in Los Angeles. (*Id.*).

B. The Defendants

Defendant Luzerne County Convention Center Authority is an authority organized pursuant to the Municipal Authorities Act of Pennsylvania. (Verified Compl. at ¶ 4). The Authority is located in Wilkes-Barre Pennsylvania and owns the Arena, Casey Plaza, and the surrounding parking lots. (*Id.*). The purpose of the Authority is to "operate, own and oversee the operations" at Mohegan Sun Arena, an Arena designated for public recreational use. (Hr'g Tr. at 56:10-13); *see also* (Ex. D-G). David Palermo is the Commissioner of the Authority. (Hr'g Tr. at 55:13-15).

Defendant SMG is a Pennsylvania general partnership located in West Conshohocken Pennsylvania. (Verified Compl. at ¶ 5). SMG is a private facility management company that performs management services and systems to operate, manage, and promote the Arena pursuant to a contract with the Authority. (*Id.*). Brian Sipe is the general manager of the Arena and is an employee of SMG. (Hr'g Tr. at 27:24-28:23). Pursuant to the contract between SMG and the Authority, SMG is responsible for overseeing the day-to-day operations of the Arena, including booking, finance, food and beverage, marketing, and sales. (*Id.*).

C. The Arena and Surrounding Areas

In general, the Arena hosts concerts of national touring acts, the Circus, Disney on Ice, the Harlem Globetrotters, World Wresting Entertainment, district basketball, and AHL hockey, among other events. (Hr'g Tr. at 34:23-4). Patrons attending events at the Arena arrive primarily by car, turn into an access road from Highland Park Boulevard, park in one of the lots outside the Arena, and then proceed on foot to one of the two entrance points for the Arena known as the East and West Gates. (Pomicter Decl. at ¶ 5). The East Gate is where most of the patrons enter the Arena and where the ticket box office is located. (Hr'g Tr. at 13:15-22).

The concrete outside the East and West gates has distinctive colors: a "dark" concrete and a "light" concrete. (Hr'g Tr. at 13:23-14:3); *see also* (Exs. P-5. D-D). The light colored concrete is closest to the entrance of the Arena, is approximately 37 feet wide, and is identified on CAD drawings as the "entry bridge." (Hr'g Tr. at 14:4-8; 49:2-16); *see also* (Ex. D-C). The dark colored concrete is approximately 60 feet wide. (*Id.*). A sidewalk connects the East and West gates and is approximately 30 feet wide and 321 feet long. (Hr'g Tr. at 33:2-12); *see also* (Ex. D-C). The sidewalk is generally open to the public, although it is primarily used for individuals attending events at the Arena or purchasing tickets to upcoming events. (Hr'g Tr. at 35:5-10). The total square footage of the concrete in front of the East Gate is 18,746 square feet. (Hr'g Tr. at 31:17-19); *see also* (Ex. D-C).

The total square footage of the concrete in front of the West Gate is 10,560 square feet. (*Id.* at 31:20-21).

D. The Protest Policies And Practices

In 2008 SMG promulgated a protest policy for all events at the Arena (the "Initial Protest Policy"). (Ex. D-B). Plaintiffs have protested at the Arena in the past and were subject to the Initial Protest Policy. Pursuant to Defendants' Initial Protest Policy and practices in place at that time, Plaintiffs were confined to a barricaded designated area in the parking lot outside the East Gate which prevented them from approaching patrons of the Circus and providing them with literature. (Hr'g Tr. at 7:8-8:10, 9:24-10); *see also* (Exs. P-3, P-4). Because Defendants' policies required Plaintiffs to be confined to a designated protest area, Plaintiffs were greatly limited in their ability to distribute literature and communicate their message. (Pomicter Decl. at ¶12); *see also* (Hr'g Tr. at 9:24-10:16, 11:2-12:4). Ms. Pomicter testified that when she and other protestors are confined to a barricaded area people are intimidated to approach her and receive literature. (Hr'g Tr. at 10:11-11-1).

In March 2016, prior to the filing of the instant action, Defendants revised the Initial Protest Policy to include two barricaded protest areas located on the so-called "dark concrete" outside both the East and West Gates (the "Revised Protest Policy"). (Hr'g Tr. at 12:4-16, 29:22-30-17, 47:8-48:3); *see also* (Ex. D-A, D-D). The two designated protest areas outside of the East and West gates measure approximately 500 to 700 square feet,

which Mr. Sipe testified could hold approximately 100 persons per designated area.[1] (Hr'g Tr. at 30:16-21). As of the date of the hearing, Defendants had not posted the Revised Protest Policy on its website, although Mr. Sipe testified that the Defendants would do so. (*Id.* at 47:8-48:3).

Plaintiffs allege that the Defendants' Revised Protest Policy and practices unconstitutionally infringes on their First Amendment rights because the regulations prohibit them from approaching Arena patrons in order to distribute literature and communicate their message.

## III. STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction. In ruling on a motion for a preliminary injunction, the Court must consider: "'(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the non-moving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.'"[2] *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356-57 (3d Cir. 2007) (quoting *Shire U.S. Inc. v. Barr Labs. Inc.*, 329 F.3d 348, 352 (3d Cir. 2003)). Although the moving party bears the burden to show its entitlement to the requested relief,

---

[1] The Revised Protest Policy contains additional changes made by Defendants that are not relevant for purposes of this motion.

[2] The Third Circuit has also characterized the first factor as whether the moving party has demonstrated "a reasonable probability of success on the merits." *McTernan v. City of York, Pennsylvania*, 577 F.3d 521, 526 (3d Cir. 2009) (internal citation and quotation marks omitted).

"each factor need not be established beyond doubt." *Stilp v. Contino*, 629 F. Supp. 2d 449, 457 (M.D. Pa. 2009), *aff'd and remanded*, 613 F.3d 405 (3d Cir. 2010).

## IV. ANALYSIS

### A. Plaintiffs Have Demonstrated A Likelihood of Success on the Merits

In order to establish likelihood of success on the merits, the moving party must proffer sufficient evidence to satisfy the elements of its underlying cause of action. *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 171 (3d Cir. 2001). The mere possibility that the moving party's claim may be defeated does not preclude a finding that it is likely to succeed on the merits. *Id.* at 172-73. Indeed, "in order to demonstrate a likelihood of success on the merits '[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits.'" *Am. Freedom Defense Initiative v. Southeastern Pennsylvania Transp. Auth.*, 92 F. Supp. 3d 314, 322 (E.D. Pa. 2015) (quoting *Oburn v. Shapp*, 521 F.3d 142, 148 (3d Cir. 1975)).

In this matter, Plaintiffs' federal constitutional claims are brought pursuant to 42 U.S.C. § 1983, alleging that Defendants' protest policies and practices violate their constitutional rights under the First and Fourteenth Amendments to the United States

Constitution.[3] "In a § 1983 civil rights action, the Plaintiffs must prove the following two essential elements: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct complained of deprived the Plaintiff of rights, privileges or immunities secured by the law or the Constitution of the United States." *Smithson v. Rizzo*, Nos. 1:14-cv-1866, 1:14-cv-1867, 2015 WL 1636143, at *8 (M.D. Pa. Apr. 7, 2015) (citing *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). The Court addresses each requirement in turn.

i. Action Under Color of State Law

Section 1983 "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when the deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . .'" *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (quoting 42 U.S.C. § 1983). A person may be liable under § 1983 only for conduct "fairly attributable to the State," meaning that the claimed deprivation was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." *Id.* at 937. Put another way, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* Here, there is no doubt that Defendant Luzerne County Convention Center Authority qualifies as a state actor for purposes of § 1983. The Authority is organized pursuant to the

[3] The Court has subject matter jurisdiction over Plaintiffs' federal constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over Plaintiffs' claims arising under the Pennsylvania Constitution pursuant to 28 U.S.C. § 1367(a).

Municipal Authorities Act of Pennsylvania, 53 Pa. C.S. §§ 5601 *et seq.*, and thus is a public governmental entity acting under color of state law. The issue then becomes whether Defendant SMG, a private entity, qualifies as a state actor such that liability under § 1983 may attach.

"A nominally private entity is a state actor 'when it is controlled by an agency of the State, when it has been delegated a public function of the State, when it is entwined with governmental policies, or when government is entwined in its management or control.'" *Sershen v. Cholish*, Civil Action No. 3:07-CV-1011, 2008 WL 598111, at *3 (M.D. Pa. Feb. 29, 2008) (quoting *Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 171 (3d Cir. 2004)). In addition, "'a challenged activity may be state action when it results from the State's exercise of coercive power, when the State provides significant encouragement, either overt or covert, or when a private actor operates as a willful participant in joint activity with the State or its agents.'" *Id.*

Here, Defendant SMG is a nominally private entity that performs management services to operate, manage, and promote the Arena pursuant to a contract with the Authority. Defendant Authority was created for the purpose of operating, owning, and overseeing the operations of the Arena for public recreation purposes in and for the County of Luzerne. (Hr'g Tr. at 56:12-16). Plaintiffs allege that, as an agent for the Authority, SMG is a "willful participant in joint activity" with the Authority and thus qualifies as a state actor under *Lugar*. The Court agrees and concludes that, at this stage in the proceedings,

Plaintiffs have sufficiently demonstrated that both the Authority and SMG are state actors for purposes of the Fourteenth Amendment and § 1983 and therefore may be held liable under § 1983 for infringing on Plaintiffs' First Amendment rights.[4]

ii. Violation Of Plaintiffs' First Amendment Rights

The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."[5] U.S. CONST. amend. I. As an initial matter, the Court notes that the Defendants' practices and policies of prohibiting leafletters from approaching patrons and confining all protestors to barricaded designated areas burdens speech protected by the First Amendment. *See, e.g.*, *N.A.A.C.P. v. Clairborne Hardware Co.*, 458 U.S. 886, 910-11, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) ("This Court has often recognized that the activity of peaceful pamphleteering is a form of communication protected by the First Amendment.") (internal citation and quotation marks omitted); *Brown v. City of Pittsburgh*, 586 F.3d 263, 269 (3d Cir. 2009) (recognizing that "leafletting, sign displays, and oral communication" are "indisputably protected forms of expression" under the First Amendment). However, it is well-settled that not all government action that restricts speech violates the First Amendment. Rather, the Supreme Court "has

---

4 "Although little is straightforward in determining whether a private actor has acted under color of state law, one directive emerges clearly from the Supreme Court's jurisprudence: the facts are crucial." *Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231, 233-34 (3d Cir. 2002).

5 The First Amendment applies to the states and its political subdivisions through the Fourteenth Amendment. *Zelman v. Simmons*-Harris, 536 U.S. 639, 648-49, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002).

adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum." *Cornelius v. N.A.A.C.P. Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *accord K.A. ex. Rel Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 106 (3d Cir. 2013).

For purposes of this motion the parties agree that the Arena, the sidewalks outside the Arena, and the Arena parking lot all qualify as nonpublic fora. But simply because a particular government owned property is designated as a nonpublic forum does not mean that the government has "unfettered power" to restrict speech in any matter it chooses. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). "As Justice O'CONNOR has observed, nonpublic forum status 'does not mean that the government can restrict speech in whatever way it likes.'" *Id.* (quoting *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 687, 112 S.Ct. 2711, 120 L.Ed.2d 541 (1992) ("*ISKCON*"). "To be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property." *Id.* (citing *Cornelius*, 473 U.S. at 800). The question then becomes, is Defendants' policy of confining leafletters and protestors to a designated area (and thereby prohibiting direct access to Arena patrons

in order to distribute literature) an unreasonable restriction on Plaintiffs First Amendment rights in light of the physical characteristics of the forum and the surrounding circumstances?[6] For the following reasons, and after considering the evidence presented at the preliminary injunction hearing, the Court finds that at this juncture Plaintiffs have proffered sufficient evidence to demonstrate a likelihood of success on the merits that Defendants' protest practices and policies are unreasonable "in light of the characteristic nature and function" of the Arena. *United States v. Kokinda*, 497 U.S. 720, 732, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (quoting *Heffron v. Int'l Soc. For Krisha Consciousness, Inc.*, 452 U.S. 640, 649, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981)).

*First*, the First Amendment conduct at issue here, leafletting, is a "classic form of speech that lies at the heart of the First Amendment." *Brown v. City of Pittsburgh*, 586 F.3d at 281 (internal citation and quotation marks omitted). Unlike face-to-face solicitation of funds, leafletting "intrudes minimally on those passing by who need only engage in the mechanical task of taking or refusing the leaflet or tract from the leafletter's hand." *Diener v. Reed*, 232 F. Supp. 2d 362, 386 (M.D. Pa. 2002), *aff'd* 77 F. App'x 601 (3d Cir. 2003). In *ISKCON*, the minimally intrusive nature of leafletting was one of the primary reasons the Court upheld a solicitation ban in a nonpublic forum but held that a prohibition on face-to-

[6] It is undisputed that Defendants' practices and policies are content and viewpoint neutral. Moreover, the parties agree with the governing standard: "in a non-public forum a government's restriction on speech must be reasonable in light of the purpose of the forum and all the surrounding circumstances and must not represent an effort to suppress speaker activity due to disagreement with the speaker's view." (Hr'g Tr. at 2:8-3:6).

face distribution of literature in a nonpublic forum was unreasonable. Justice O'Connor, in her oft-cited and controlling concurrence, recognized that:

> [L]eafletting does not entail the same kinds of problems presented by face-to-face solicitation. Specifically, one need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand. The distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead the recipient is free to read the message at a later time. . . . With the possible exception of avoiding litter . . . it is difficult to point to any problems intrinsic to the act of leafletting that would make it naturally incompatible with a large, multipurpose forum such as those at issue here.

*ISKCON*, 505 U.S. at 690 (internal citation and quotation marks omitted). For similar reasons, Courts have stuck down regulations that prohibit leafletters from directly accessing individuals in order to peacefully distribute literature. *See, e.g., Brown v. City of Pittsburgh,* 586 F.3d at 279 ("Because the Ordinance here, unlike the Colorado statute [in *Hill*], establishes a fifteen-foot buffer zone around the clinic entrances, leafletters cannot stand directly next to the entrance door to ensure arm's-length access to all entering patients. . . . According to Brown, the addition of the buffer zone effectively forecloses her ability to leaflet, rendering the Ordinance unconstitutional on its face. The question is close, but we think Brown has the better argument.").[7] Defendants' protest policies and practices similarly do not ensure arm's-length access to all entering patrons at the Arena.

[7] Although The Supreme Court in *Hill v. Colorado*, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000), upheld the validity of an ordinance imposing an 8 foot buffer zone, the Court plainly observed that "demonstrators with leaflets might easily stand on the sidewalk at entrances (without blocking the entrance) and, without physically approaching those who are entering the clinic, peacefully hand them leaflets as they pass by." *Id.* at 729-30. Defendants' practices and policies do not permit Plaintiffs such access.

*Second*, the proposed rationale behind the prohibition on face-to-face leafletting does not support Defendants' policies and practices. As in *ISKCON*, the Defendants have "not offered any justifications or record evidence to support its ban on the distribution of pamphlets alone." 505 U.S. at 691. Defendants "provided no independent reason," other than mere speculation, "for prohibiting leafletting, and the record contains no information from which we can draw an inference that would support its ban." *Id.* at 692. In response to a question concerning the problems that would be created "if the designated areas were eliminated, protestors can roam free, intermingle with the patrons as they entered or exited [the] arena building" Mr. Sipe testified:

> There's a few. The first one would be it ***can potentially*** block customers from coming to the events if there are too many protestors out front. Guests would have an issue getting beyond them into the doors. Also we would have to add an exponential amount more security out front to be in that area to make sure that not only are the protestors adhering to the policy but make sure there are no altercations of any kind with guests who are approaching the building who don't necessarily want to be discussed with.

(Hr'g Tr. at 36:12-23) (emphasis added).[8] Similarly, Mr. Sipe's testimony that SMG would need to "add at least 15 to 20 guards just simply for the front area," to patrol leafletters outside the designated protest areas is speculative and appears unreasonable.[9] (*Id.* at

[8] Mr. Sipe's testimony that permitting protestors outside the designated area would disrupt the ingress and egress of patrons is belied by the fact that, under the Defendants Revised Protest Policies, patrons exiting the Arena would exit directly into the path of the designated protests areas. (Hr'g Tr. at 52:13-53:6). This further supports a determination that Defendants' Revised Protest Policies are unreasonable.

[9] In fact, Mr. Sipe expressly acknowledged the speculative nature of his answer, stating that "[i]t would be hard to put a number to it." (Hr'g Tr. at 39:7-10).

39:3-13). Indeed, he also testified that the Arena hires "a basic amount [of security] no matter what the event is, which is somewhere in the range of 15 to 25." (*Id.* at 50:2-16). It is unclear why the Defendants would need to double its security to patrol a small amount of leafletters peacefully distributing literature on the sidewalks and concrete outside the Arena.

*Finally*, taking into consideration the physical characteristics of the Arena and the grounds and all the surrounding circumstances, the Court concludes that leafletting would not interfere with the purposes of the Arena and the surrounding areas. The grounds outside the Arena are quite large. The concrete outside the East Gate is over 18,000 square feet and the concrete outside the West Gate is over 10,000 square feet. (Hr'g Tr. at 31:17-21). The sidewalk connecting the East and West Gates is over 30 feet wide and 321 feet long. (Hr'g Tr. at 33:2-12); *see also* (Ex. D-C). Moreover, the Arena was explicitly constructed for ***public*** recreation purposes and peaceful leafletting and distribution of literature is not wholly incompatible with that Arena's designated purpose.[10] (Ex. D-G). Like Justice O'Connor in *ISKCON*, the Court "cannot see how peaceful pamphleteering is

[10] Defendants maintain that the Third Circuit's decision in *International Soc. for Krishna Consciousness, Inc. v. New Jersey Sports & Exposition Auth.*, 691 F.2d 155 (1982), conclusively resolves Plaintiffs' claims. In that case, the Court of Appeals upheld the policy of the New Jersey Sports and Exposition Authority which forbid the solicitation of money and distribution of literature and other goods. A reading of that case, however, demonstrates it is readily distinguishable. For example, the Plaintiffs in that case proposed to "distribute literature in return for donations," making solicitation and leafletting indistinguishable activities. *Id.* at 159. Here, in contrast, Plaintiffs do not seek to solicit any donations or contributions. Moreover, the Third Circuit's rationale for upholding the Meadowland's restrictions on solicitation and leafletting focused on the fact that Plaintiffs' proposed conduct would "intercept spectators and request donations from them" which "would compete with the Authority for its patrons' money and disrupt the normal activities of the complex." *Id.* at 161. Furthermore, the Arena at issue here seats approximately 10,000 persons as compared to the Meadowlands which seats approximately 80,000 persons, making crowd control less of an issue at the Arena. *Id.* at 162; *see also* (Hr'g Tr. at 36:24-37:1).

incompatible" with the purpose of the Arena. *ISKCON*, 505 U.S. at 692. The Court therefore concludes that Plaintiffs' claim that Defendants' protest policies and practices unreasonably restrict Plaintiffs' First Amendment rights has merit. Although Defendants may enact reasonable measures to protect access to the Arena they cannot enact measures that effectively prohibit Plaintiffs from communicating their message. Therefore, Plaintiffs have demonstrated a likelihood of success on the merits.

    iii. Violation Of Plaintiffs' Rights Under The Pennsylvania Constitution

Plaintiffs also allege that the Defendants practices and policies violate Article I § 7 of the Pennsylvania Constitution which provides, in relevant part, that "[t]he free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." Pa. Const. art. I, § 7. The Pennsylvania Constitution "provides protection for freedom of expression that is broader than the federal constitutional guarantee." *Pap's A.M. v. City of Erie*, 571 Pa. 375, 399, 812 A.3d 591 (Pa. 2002) (internal citation and quotation marks omitted); *accord One Three Five, Inc. v. City of Pittsburgh*, 951 F. Supp. 2d 788, 820 (W.D. Pa. 2013). Accordingly, the Court also holds that Plaintiffs are likely to succeed on the merits of their claim under Article I § 7 of the Pennsylvania Constitution. *See Moeller v. Bradford Cnty.*, 444 F. Supp. 2d 316, 320 (M.D. Pa. 2006) ("[I]t is well settled that individual plaintiffs may bring suit for injunctive relief under the Pennsylvania Constitution.").

  B. Plaintiffs Have Demonstrated That They Will Suffer Irreparable Harm if the Preliminary Injunction Is Not Granted

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *accord Swartzwelder v. McNeilly*, 297 F.3d 228, 241 (3d Cir. 2002). And where, as here, a Plaintiff establishes a reasonably probability of success on the merits they "almost certainly" can demonstrate irreparable injury. *A.C.L.U. v. Reno*, 217 F.3d 162, 180 (3d Cir. 2000), *vacated on other grounds sub nom.*, *Ashcroft v. A.C.L.U.*, 533 U.S. 973, 122 S.Ct. 19, 150 L.Ed.2d 801 (2001). Because Plaintiffs have sufficiently demonstrated likelihood of success of the merits it follows that, in the absence of injunctive relief, Plaintiffs will suffer irreparable injury.

C. Suspension of Defendants' Protest Policies and Practices Pending the Outcome of the Litigation Will Not Cause Defendants Irreparable Harm

To determine whether preliminary injunctive relief is appropriate the Court next balances any harm the Plaintiffs may experience against the harm Defendants might suffer if Plaintiffs are allowed to leaflet outside the barricaded designated areas pending the outcome of the litigation. "If the potential harm to the nonmovant outweighs the potential benefits bestowed upon the movant, injunctive relief should generally be denied." *Stilp*, 629 F. Supp. 2d at 467.

Here, Plaintiffs harm—the curtailment of their constitutional rights under the First Amendment—is real, irreparable, and substantial. In contrast, the harm to Defendants is speculative. *See Pocono Mountain Sch. Dist.*, 710 F.3d at 114 (noting that the Defendant

failed to identify harm resulting from the preliminary injunction when they "failed to identify any disruption" caused by the Plaintiffs conduct). Defendants have not demonstrated that Plaintiffs' planned protesting and leafletting would disrupt the business activities at the Arena or cause Defendants financial loss. The Court concludes that the harm to Plaintiff substantially outweighs any harm to the Defendant.

D. The Public Interest Favors Granting The Injunction

Finally, the Court must weigh whether the public interest favors the suspension of Defendants' policy pending the outcome of this litigation. "As a practical matter, if a plaintiff demonstrates both likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Am. Tel. & Telegraph Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). In addition, the Third Circuit has recognized that "[i]n the absence of legitimate countervailing concerns, the public interest clearly favors the protection of constitutional rights," *Council for Alternative Political Parties v. Hooks*, 121 F.3d 876, 883-84 (3d Cir. 1997), and that "[c]urtailing constitutionally protected speech will not advance the public interest." *ACLU v. Reno*, 217 F.3d at 180-81. Thus, the public interests favor granting Plaintiffs' motion for preliminary injunction.

E. Security Bond

Rule 65(c) of the Federal Rules of Civil procedure provide that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Third Circuit strictly interprets this rule, but notes "that there may be instances in which a strict reading of the rule is not appropriate." *Elliott v. Kiesewetter*, 98 F.3d 47, 59 (3d Cir. 1996). This exception requires "a balance of the equities of the potential hardships that each party would suffer as a result of the preliminary injunction." *Id.* at 60. "Where the balance of these equities weighs overwhelmingly in favor of the party seeking the injunction, a district court has the discretion to waive the Rule 65(c) bond requirement." *Id.*

Neither the Plaintiffs nor Defendants offer evidence regarding the extent that the proposed injunction will occasion financial loss. In similar circumstances courts in this Circuit have required the moving party to post a nominal bond. *See, e.g.*, *Am. Freedom Defense Initiative*, 92 F. Supp. 3d at 331 ("Neither party has addressed the bond requirement. However, Plaintiffs seek injunctive relief to protect their First Amendment rights. [Defendant] did not offer any evidence that they will suffer a financial loss as a result of the injunction. Therefore, I will require Plaintiffs to post a nominal bond of $100 before the preliminary injunction will issue."); *Stilip*, 629 F. Supp. 2d at 468 (requiring moving party to post a nominal bond of $250 and finding that "this amount will protect the parties' respective interests without imposing an undue hardship upon a plaintiff seeking vindication

of his First Amendment rights to freedom of speech"). Accordingly, the Court will require Plaintiff to post a nominal bond of $100 pursuant to Rule 65(c) before the preliminary injunction will issue.

## V. CONCLUSION

For the foregoing reasons, the Court will grant Plaintiffs' Motion for Preliminary Injunction on the terms specified in this Court's separate order which follows.

Robert D. Mariani
United States District Judge