THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SILVIE POMICTER and
LAST CHANCE FOR ANIMALS          :
                                 :
        Plaintiffs,              :
   v.                            :        3:16-CV-00632
                                 :        (JUDGE MARIANI)
LUZERNE COUNTY CONVENTION         :
CENTER AUTHORITY and              :
SMG                              :
                                 :
        Defendants.              :

## MEMORANDUM OPINION

### I.    Introduction

This action involves a First Amendment challenge to the government's restrictions on

protesting activity in a non-public forum.  On April 15, 2016, Plaintiffs Silvie Pomicter and

Last Chance for Animals ("Plaintiffs") filed a verified complaint against Defendants Luzerne

Country Convention Center Authority (the "Authority") and SMG ("SMG" and, together with

the Authority, "Defendants"), alleging that Defendants' policies and practices violate the First

Amendment.  Doc. 1.  In particular, Plaintiffs seek both declaratory and injunctive relief

prohibiting the Defendants from enforcing their policy of (1) confining all leafletting and

protesting activity to barricaded designated areas on the sidewalk outside of the Mohegan

Sun Arena (the "Arena"), (2) prohibiting use of voice amplification by protestors, and (3)

prohibiting use of profanity and vulgarity by protestors.

On April 15, 2016, Plaintiffs filed a motion for preliminary injunction. Doc. 2. The Court held an evidentiary hearing on April 25, 2016, and granted Plaintiffs' motion as modified on April 27, 2016. Doc. 19. On November 13, 2017 and December 18, 2017, the Court held a non-jury trial, during which the Court heard testimony from Sylvie Pomicter, Chris DeRose, president of Last Chance for Animals, and Brian Sipe, the general manager of the Arena. In addition, the parties have stipulated that the evidence that was received at the preliminary injunction hearing is part of the trial record. Doc. 42, at 11. Upon review of all testimony and evidence of record in this case, the Court concludes that the Defendants' leafletting restriction, voice amplification ban, and profanity or vulgarity ban, as reflected in the Revised Protest Policy, violate the First Amendment principles set forth by Supreme Court case law. Accordingly, judgment will be entered in favor of the Plaintiffs and against Defendants.

## II.    Findings of Fact

### a.  The Parties

1. Plaintiff Sylvie Pomicter is an individual residing in Lackawanna County, PA, and has been an animal rights activist for many years. Stipulated Facts for Trial, Doc. 42-1 ("Stipulated Facts"), ¶ 12.

2. Last Chance for Animals ("LCA") is a non-profit organization dedicated to eliminating animal exploitation through education, investigations, legislation, and media attention. LCA is organized in California with an address in Los Angeles, CA. *Id.* ¶ 16.

2

3. Chris DeRose is the president and founder of LCA.  Doc. 52 ("Trial Tr.") at 44:4-5.

4. Both Ms. Pomicter and LCA are opposed to use of animals by circuses. Stipulated Facts, ¶ 11.

5. Ms. Pomicter regularly protests outside businesses and venues that she believes engage in cruelty to animals.  *Id.* ¶ 13.

6. Ms. Pomicter obtains the literature that she distributes from People for the Ethical Treatment of Animals ("PETA"), an animal rights organization.  *Id.* ¶ 14.

7. Ms. Pomicter uses Facebook, email, and the telephone to organize animal rights activities to attend protests, including protests at the Arena.  *Id.* ¶ 15.

8. Defendant Luzerne County Convention Center Authority is an authority organized pursuant to the Municipal Authorities Act of Pennsylvania with an address of 255 Highland Park Boulevard, Wilkes-Barre, PA 18702.  *Id.* ¶ 3.

9. Defendant SMG is an organization contracted by the Authority to oversee the day-to-day operations of the Arena, including booking, finance, food and beverage, marketing, and sales.  *Id.* ¶ 7.

10. Brian Sipe is the general manager of the Arena and an employee of SMG. *Id.* ¶ 6.

### b. The Arena and Surrounding Areas

11. The Authority owns the Arena and surrounding parking lots.  *Id.* ¶ 4.

3

12. The purpose of the Authority is to operate, own, and oversee the operations at the Arena. *Id.* ¶ 5.

13. The Arena is located in Wilkes-Barre, Luzerne County, Pennsylvania. *Id.* ¶ 1.

14. The Arena is designated for public recreational use. *Id.* ¶ 2.

15. In general, the Arena hosts concerts of national touring acts, the Circus, Disney on Ice, the Harlem Globetrotters, World Wresting Entertainment, district basketball, and AHL hockey, among other events. Doc. 23 ("April 25, 2016 Hr'g Tr.") at 36:25-37:4.

16. Patrons attending events at the Arena arrive primarily by car, turn into an access road from Highland Park Boulevard, park in one of the lots outside the Arena, and then proceed on foot to one of the two entrances known as the East and West Gates. Ex. P-7 ("Pomicter Decl."), ¶ 5.

17. The concrete outside the East and West gates has two distinctive colors, a "dark" concrete and a "light" concrete. Undisputed Facts ¶ 8.

18. The total square footage of the concrete in front of the East Gate is 18,746 square feet. *Id.* ¶ 9.

19. The total square footage of the concrete in front of the West Gate is 10,560 square feet. *Id.* ¶ 10.

20. The East Gate is where most of the patrons enter the Arena and where the ticket box office is located. April 25, 2016 Hr'g Tr. at 15:18-19.

21. The light colored concrete is closest to the entrance of the Arena, approximately 37 feet wide, and identified as the "entry bridge." *Id.* at 16:4-8; 49:2-16; *see also* Ex. D-C.

22. A sidewalk connects the East and West gates and is approximately 30 feet wide and 321 feet long. *Id.* at 35:2-12; *see also* Ex. D-C.

23. The sidewalk is generally open to the public, although it is primarily used for individuals attending events at the Arena or purchasing tickets to upcoming events. *Id.* at 37:5-10.

24. The Arena is large enough to hold up to 10,000 people for an event. *Id.* at 38:24-39:1.

### c. The Protest Policies

25. In 2008, SMG promulgated a protest policy for all events at the Arena (the "Initial Protest Policy"). Ex. D-B.

26. Pursuant to Defendants' Initial Protest Policy and practices in place at that time, Plaintiffs were confined to a barricaded designated area in the parking lot outside the East Gate, which prevented them from approaching patrons of the Circus and providing them with literature. April 25, 2016 Hr'g Tr. at 9:11-22.

27. In March 2016, prior to the filing of the instant action, Defendants revised the Initial Protest Policy to include two barricaded protest areas located on the "dark concrete" outside both the East and West Gates (the "Revised Protest Policy"). *Id.* at 31:22-23; 32:1-

21; see also Ex. D-H. The protest areas would be able to be expanded up to 500 to 700 square feet depending on the number of protestors, with an estimated allowance of up to 5 square foot per person. Id.

28. The Revised Protest Policy states that all protestors "are to be within the designated area outside [of] the East & West Gate," and that "[h]andouts can only be distributed from within [the] designated area." Ex. D-H.

29. The Revised Protest Policy further states that "[a]ny promotional verbiage suggesting vulgarity or profanity is not permitted" and "[u]se of profanity is prohibited." Id.

30. Finally, the Revised Protest Policy prohibits any use of "artificial voice amplification." Id.

### d. Events Since the Preliminary Injunction Order

31. After a preliminary injunction hearing, the Court issued a preliminary injunction Order on April 27, 2016. Doc. 19.

32. The Order allowed up to 20 protestors to "distribute literature on the sidewalk connecting the East and West Gates or on the darker colored concrete outside the East and West Gates at any one time." Id. at 3. In other words, the Court's Order allowed up to 20 protestors to leaflet freely outside the designated areas, so long as they do not "approach patrons who are standing in line to purchase tickets ... walking through the parking area or vehicle traffic lanes ... [or] within the first six feet of entry onto the darker concrete from the parking lot." Id.

6

33. After the Order was issued, Plaintiff Sylvie Pomicter protested outside the Arena on two days in April, 2016 and two days in April, 2017, when the Ringling Bros. circus was performing at the Arena. Trial Tr. at 5:11-15.

34. Chris DeRose attended an April 2016 protest with Ms. Pomicter at the Arena. *Id.* at 45:6-46:3.

35. Ms. Pomicter regularly keeps track of how many protesters attend the events that she organizes, as well as how much literature is distributed at each event. She has done so for her protests for thirty-three years. *Id.* at 6:4-14; 9:16-20.

36. On the two days she protested outside the Arena in 2016, Ms. Pomicter recorded the attendance of 39 protesters in total. *Id.* 5:20-24. On the two days she protested outside the Arena in 2017, Ms. Pomicter recorded the attendance of 20 protesters. *Id.* 6:2-3. To Ms. Pomicter's knowledge, her protestors stayed in the East Gate area of the Arena, not the West Gate. *Id.* 25:9-14.

37. For the protests that Ms. Pomicter attended, the Authority set up barricaded areas for the protestors to stand in outside the East and West Gage entrances. *Id.* 7:18-23; Ex. D-A.

38. However, consistent with the Court's preliminary injunction Order, the Authority also allowed some protestors, including Ms. Pomicter, to leave the barricaded area and approach patrons with leaflets in 2016. *Id.* 8:2-11. During the 2016 protests, about 12 protestors distributed literature and talked to patrons. *Id.*

7

39. During the protests in 2016, the designated barricaded area at the East Gate was a small, rectangular enclosure constructed from bike racks. The enclosure was set against the edge of the East Gate fence. Protestors inside the barricaded area stood facing patrons in a single line. *Id.* 7:18-23; *see also* Exs. P-10, P-16, P-17, P-22, P-23 ("Video Clip Exhibits").

40. Both Ms. Pomicter and Mr. DeRose testified that the protesters in the barricaded areas drew very little attention from the approaching patrons. *Id.* 9:7-10, 47:7-14, 50:12-21, 51:2-4. They testified that they were "barely noticed" by the patrons, that the patrons standing in line near the protestors "were not even looking over at us," and that perhaps "one or two" approached the protestors inside the barricaded areas to take leaflets from them. *Id.* 9:7-10; 50:12-21, 51:2-4.

41. Video clips introduced at trial showed that there were about 20 to 30 feet between the barricaded area and the nearest line of patrons who were waiting in line for ticket sales. *See, e.g.,* Ex. P-22. There were several lines of patrons for ticket sales in the area, and the line of patrons closest to the barricaded area blocked the view of patrons from other lines from being able to see the protestors. *Id.* 10:16-11:1; 48:16-19.

42. During the protests in 2016, Ms. Pomicter observed approximately twelve protestors distributing leaflets outside the barricaded area. *Id.* 8:7-11. Video evidence showed that most, if not all, interactions between leafletting protestors and patrons were

friendly and non-confrontational, including a family with a little girl who smiled while taking leaflets from Ms. Pomicter. *See e.g.* Exs. P-10, P-23.

43. However, there was video evidence that showed one patron who saw the literature that a protestor was distributing and raised his middle finger to the protestor; the protestor withdrew his leaflet and the patron walked on without incident. *See* Ex. P-16; Trial Tr. 14:19-22. The gesture did not prompt any reaction from protestors or other patrons. Both Ms. Pomicter and Mr. DeRose testified that they do not typically confront such persons. Trial Tr. 14:12-25; 15:10-17; 51:14-17.

44. During the 2016 protests, one of Ms. Pomicter's protestors had a T-shirt that contained profanity (specifically, the "F" word). Mr. Sipe, who was present at the protest, brought the issue to Ms. Pomicter's attention, and Ms. Pomicter in turn asked the protestor to zip up her jacket so as to cover up the word. The protestor did so; and she was allowed to continue to engage in protest activities. *Id.* 23:6-24:2.

45. In the year prior to the Court's preliminary injunction order, Ms. Pomicter estimated that her protestors were able to hand out 30 leaflets from inside the barricaded area. *Id.* 9:23-10:2.

46. In 2016, after some protestors were allowed to leaflet outside the barricaded area, Ms. Pomicter estimated that her protestors were able to hand out 780 leaflets. *Id.* 9:11-20.

9

47. In April, 2016 and October, 2016, then-Presidential candidate Donald Trump held rallies at the Arena. *Id.* 87:24-88:12. At those rallies, secret service personnel determined the protest policies. *Id.* 88:15-16. Brian Sipe testified that he believed the secret service's directions preempted the Court's preliminary injunction Order on issues of crowd control. *Id.* 101:15-102:8. At the October 2016 rally, Mr. Sipe believed that approximately four anti-Trump protestors showed up at the event; they were directed to stay in a grassy area at the Arena. *Id.*

48. The Authority contends that the designated areas for protestors serve to prevent crowd congestion, prevent patrons from "hav[ing] to interact with [protestors]," manage "security risk" arising from potential confrontations between patrons and protestors, and prevent loss of revenue and goodwill from patrons who "do not want to be subjected to one on one interaction with or risk confrontation with protestors." *Id.* 72:22-73:5; 74:16-22; Doc. 46 at 2.

49. With respect to additional security costs, Mr. Sipe testified that if the Authority anticipated protestors at an event, it would hire an estimated four additional security guards for the Arena, amounting to an estimated cost of $648 per event. *Id.* 82:20-24; 93:14-21, Ex. D-R.

50. For the Plaintiffs' protests, the Arena hired three additional security personnel for each event. *Id.*

10

51. Mr. Sipe testified that no patron has complained to him about any interactions with protestors, nor is he aware of any complaints to the Arena about protestors. *Id.* 90:16-22.

52. The Arena retains the authority to ban weapons, body armor, open flames, fighting, inciting violence, and making threats. *Id.* 94:5-95:11. The Arena has security guards and two law enforcement officers from Wilkes-Barre Township Police present at all events. If a fight were to occur, the police officers would be able to take necessary legal action. *Id.*

53. The Authority has only designated the sidewalk for expressive activity during events; the area is not designated for expressive activity during non-event times. *Id.* 95:12-18.

54. When asked about the treatment of counter protestors, Mr. Sipe testified that both protestors and counter protestors would be confined to the same barricaded area, though the area would be expanded as necessary. *Id.* 96:12-24. Mr. Sipe stated this would allow "[l]aw enforcement [to] have an easier time controlling that controlled atmosphere, and also our patrons would not have to walk through people back and forth." *Id.*

### III.    Conclusions of Law

1. Plaintiffs allege unconstitutional infringement on the freedom of speech under the First and Fourteenth Amendment to the United States Constitution and Section 7, Article

11

I of the Pennsylvania constitution, because Defendants' protest policies and practices violate their right to expressive activity. Doc. 1.

2. The Court has subject matter jurisdiction over Plaintiffs' federal constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343.

3. Plaintiffs' federal constitutional claims are brought pursuant to 42 U.S.C. § 1983. Section 1983 "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when the deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ....'" *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (quoting 42 U.S.C. § 1983).

4. In this case, the Court has supplemental jurisdiction over Plaintiffs' state claims arising under the Pennsylvania Constitution pursuant to 28 U.S.C. § 1367(a).

5. "The prevailing view is that Pennsylvania does not recognize a private right of action for damages in a suit alleging violation of the Pennsylvania Constitution." *Gary v. Braddock Cemetery*, 517 F.3d 195, 207 n. 4 (3d Cir. 2008). However, "[a]lthough monetary relief is barred for claims under the Pennsylvania Constitution, equitable remedies are available." *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 442 F. App'x 681, 688 (3d Cir. 2011). *See also Gary v. Pennsylvania Dep't of Labor & Indus.*, 2014 WL 2720805, at *10 (M.D. Pa. June 13, 2014) ("Although monetary relief is unavailable, 'other remedies, such as declaratory or injunctive relief ... are ... remedies under the Pennsylvania

12

Constitution.'") (citing *Jones v. City of Philadelphia*, 890 A.2d 1188, 1215–16 (Pa. Commw. Ct. 2006)). The state constitutional claim is therefore viable because "it is well settled that individual plaintiffs may bring suit for injunctive relief under the Pennsylvania Constitution." *Moeller v. Bradford Cty.*, 444 F. Supp. 2d 316, 320 (M.D. Pa. 2006).

6. The corresponding Pennsylvania constitutional provision "provides protection for freedom of expression that is broader than the federal constitutional guarantee." *Pap's A.M. v. City of Erie*, 571 Pa. 375, 399, 812 A.3d 591 (Pa. 2002) (internal citation and quotation marks omitted). Accordingly, any restrictions that are unreasonable under the federal constitution will also be found unreasonable under Pennsylvania law.

7. There is no dispute that the Authority qualifies as a state actor for purposes of § 1983, as it is organized pursuant to the Municipal Authorities Act of Pennsylvania. 53 Pa. C.S. §§ 5601 *et seq.*

8. Plaintiffs are bringing a facial challenge to the Revised Protest Policy, arguing that the leafletting, voice amplification, and profanity restrictions are unconstitutional as a matter of law. Doc. 1, ¶¶ 26-28. *See also* Oral Argument Transcript, December 18, 2017 ("Oral Arg. Tr."), at 10:21-22 ("Because the policy is, as we understand it, applied to everyone the same, it is a facial challenge.")

9. In First Amendment cases where "the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816, 120 S. Ct. 1878, 1888, 146 L. Ed. 2d 865

(2000). But "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800, 105 S. Ct. 3439, 3447, 87 L. Ed. 2d 567 (1985).

10. Instead, the courts should conduct "a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Id.* Government-owned property may fall under several categories for the forum analysis: a traditional public forum, a designated public forum, or a nonpublic forum. *Id.*

11. It is undisputed in this case that the Arena constitutes a non-public forum. Trial Tr. at 3:22-4:2. In a non-public forum, the government may restrict access "as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius*, 473 U.S. at 800 (internal citation omitted).

12. "The reasonableness of the Government's restriction [on speech in a nonpublic forum] must be assessed in light of the purpose of the forum and all the surrounding circumstances." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 687, 112 S. Ct. 2711, 2712, 120 L. Ed. 2d 541 (1992) (hereinafter "*ISKCON v. Lee*") (citing *Cornelius*, 473 U.S. at 809). "[A] restriction on speech in a nonpublic forum is

14

'reasonable' when it is 'consistent with the [government's] legitimate interest in preserv[ing] the property ... for the use to which it is lawfully dedicated.'" *Id.* (citing *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 50-51, 103 S.Ct. 948, 958, 74 L.Ed.2d 794 (1983)).

13. Unlike the strict scrutiny review required of public forum restrictions, the reasonableness review for nonpublic forum restrictions "does not require narrow tailoring or the absence of less restrictive alternatives." *NAACP v. City of Philadelphia*, 834 F.3d 435, 441 (3d Cir. 2016). However, it does require a "more exacting review" than the familiar rational basis standard. *Id.* at 443. "Indeed, it has been the Supreme Court's 'consistent position that democracy stands on a stronger footing when courts protect First Amendment interests against legislative intrusion, rather than deferring to merely rational legislative judgments in this area.'" *Id.* (citing *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 519, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981)).

14. When analyzing the reasonableness of speech restrictions, courts may rely on "record evidence or commonsense inferences. First...the evidence or commonsense inferences must allow us to grasp the purpose to which the City has devoted the forum. And second, the evidence or commonsense inferences also must provide a way of tying the limitation on speech to the forum's purpose." *Id.* at 445. Thus, the Arena need not prove that its restrictions are the *only* ways to achieve its articulated goals, but it must provide at

least "a legitimate explanation for the restriction," whether based on record evidence or common sense. *Id.*

### The Leafletting Restriction

15. The Revised Protest Policy confines protestors to "the designated area outside [of] the East & West Gate" and states that "[h]andouts can only be distributed from within [the] designated area." Ex. D-H. Plaintiffs argue that limiting protestors to a barricaded area is unreasonable because it renders the protestors not visible or audible to many of the patrons in the sidewalk area, prevents protestors from approaching patrons to hand out leaflets, and causes patrons to become "too intimidated" to approach protestors inside the barricades to receive literature. Doc. 48, at 5-7.

16. At the outset, the Court notes that a restriction on the ability to leaflet is a burden on the freedom of speech. *See, e.g., Brown v. City of Pittsburgh*, 586 F.3d 263, 269 (3d Cir. 2009) (recognizing that "leafletting, sign displays, and oral communication" are "indisputably protected forms of expression" under the First Amendment).

17. Leafletting is especially entitled to protection in First Amendment jurisprudence. "[O]ne-on-one communication is the most effective, fundamental, and perhaps economical avenue of political discourse .... And handing out leaflets in the advocacy of a politically controversial viewpoint…is the essence of First Amendment expression; [n]o form of speech is entitled to greater constitutional protection." *McCullen v. Coakley*, 134 S. Ct. 2518, 2536, 189 L. Ed. 2d 502 (2014) (citing *McIntyre v. Ohio Elections*

16

*Comm'n*, 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995)). It is "a First

Amendment activity that intrudes minimally on those passing by who need only engage in

the mechanical task of taking or refusing the leaflet or tract from the leafleteer's hand."

*Diener v. Reed*, 232 F. Supp. 2d 362, 386 (M.D. Pa. 2002) (citing *ISKCON v. Lee*, 505 U.S.

at 690), *aff'd*, 77 F. App'x 601 (3d Cir. 2003).

18. The seminal Supreme Court case on leafletting activity, *ISKCON v. Lee*, is a

plurality opinion, for which Justice O'Connor's concurrence has been widely interpreted as

the controlling opinion since. *See, e.g., New England Reg'l Council of Carpenters v. Kinton*,

284 F.3d 9, 20 (1st Cir. 2002) ("Because Justice O'Connor's *ISKCON* concurrence

constitutes the narrowest ground for the decision, it is the most authoritative pronouncement

on the standards applicable to leafletting in a non-public forum."); *NAACP*, 834 F.3d at 444–

45 ("Justice O'Connor's views [in *ISKCON*] on leafleting were the narrowest and therefore

speak for the Court."); *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1289 (10th

Cir. 1999) (acknowledging that Justice O'Connor "provided the swing vote in the highly-

fractured *Lee* decision, but as the narrowest majority holding, we are bound by it.")

19. According to Justice O'Connor, the minimally intrusive nature of leafletting

distinguished it from a similar First Amendment activity—solicitation of money:

> [L]eafletting does not entail the same kinds of problems presented by
> face-to-face solicitation. Specifically, one need not ponder the contents of
> a leaflet or pamphlet in order mechanically to take it out of someone's
> hand. The distribution of literature does not require that the recipient stop
> in order to receive the message the speaker wishes to convey; instead the

recipient is free to read the message at a later time . . . . With the possible exception of avoiding litter . . . it is difficult to point to any problems intrinsic to the act of leafletting that would make it naturally incompatible with a large, multipurpose forum such as those at issue here.

*ISKCON*, 505 U.S. at 690 (internal citation and quotation marks omitted).

20. In fact, several courts have accorded greater protection to leafletting than to solicitation. *See, e.g., Chicago Acorn v. Metro. Pier & Exposition Auth.*, 150 F.3d 695, 702 (7th Cir. 1998) (holding that the government cannot ban leafletting at Navy Pier, a nonpublic forum, and framing *ISKCON*'s holding as "decisive in favor of so much of the district judge's order ... to rescind its ban against leafletting .... But it is equally decisive against any suggestion that the plaintiffs have a right to picket, stage marches, hold demonstrations, wave posters, shout through bullhorns or public-address systems, *solicit passersby for money or signatures*, or harangue them from soapboxes...") (emphasis added); *Int'l Soc'y for Krishna Consciousness of California, Inc. v. City of Los Angeles*, 764 F.3d 1044, 1053 (9th Cir. 2014) (holding that a ban on solicitation was reasonable, and noting that the policy still allows the plaintiff "to solicit future donations online or via preaddressed envelopes, *to distribute Krishna consciousness literature*, and to spread its word to willing passersby.") (emphasis added); *ISKCON Miami, Inc. v. Metro. Dade Cty.*, 147 F.3d 1282, 1290 (11th Cir. 1998) (holding that a ban on solicitations at an international airport was reasonable, and noting that "the regulations challenged here do permit the distribution of free literature" in eight designated areas spread throughout the airport).

18

21. Defendants rely heavily on *International Soc. for Krishna Consciousness, Inc. v. New Jersey Sports & Exposition Auth.* 691 F.2d 155 (1982) in support of the validity of its leafletting ban. But in that case, the Court of Appeals upheld the policy of the New Jersey Sports and Exposition Authority which forbade simultaneous solicitation and leafletting. The Plaintiffs in that case proposed to "distribute literature in return for donations," collapsing solicitation and leafletting into a single, indivisible act. *Id.* at 159.

22. The Third Circuit specifically noted that the plaintiff "does not wish to distribute literature without simultaneously soliciting money. *Were that issue presented,* the question would be whether a total ban is reasonable, taking into consideration the fact that all organizations may claim the same right." *Id.* at 161 n. 3 (3d Cir. 1982).

23. *New Jersey Sports & Exposition* therefore left open the question of whether a complete ban would be reasonable if the act of distributing literature were separated from the act of solicitation. In fact, the Authority conceded as much in closing argument: "technically, the [Third Circuit] had in front of it a literature and solicitation case, so it didn't decide on the merits of that issue, if it had only been literature." Oral Arg. Tr. at 30:21-23. Here, by contrast, Plaintiffs do not seek the right to solicit donations as well as the right to leaflet; they simply wish to leaflet beyond the barricaded areas that the Authority has erected for protestors.

24. Furthermore, the Court clearly found the act of soliciting *money* from patrons to be a salient factor in its reasoning, finding that it "would compete with the Authority for its

19

patrons' money and disrupt the normal activities of the complex...contributions to ISKCON

or any other outside group do not aid the Authority. On the contrary, they reduce its income

to the extent that the soliciting organization receives funds that might otherwise be spent at

the concessionaire stands and betting windows." *Id.* at 161–62. Finally, and perhaps most

importantly, *New Jersey Sports & Exposition* preceded *ISKCON* v. *Lee*, and thus was

decided without the benefit of Justice O'Connor's distinctions between leafletting and

solicitation.

   25. This is not to say that the ability to leaflet is unfettered. Courts generally will

not allow leafletters block ingress or egress. In *Hill v. Colorado*, for example, the Supreme

Court upheld an 8-foot "buffer zone" at abortion clinics, finding that the restriction "leaves

ample room to communicate a message through speech," and that "demonstrators with

leaflets might easily stand on the sidewalk at entrances (without blocking the entrance) and,

without physically approaching those who are entering the clinic, peacefully hand them

leaflets as they pass by." *Hill v. Colorado*, 530 U.S. 703, 729–30, 120 S. Ct. 2480, 2496–

97, 147 L. Ed. 2d 597 (2000). *See also Brown*, 586 F.3d at 281 (holding that while the

combination of both a buffer zone and a bubble zone was unconstitutional, a fifteen-foot

buffer zone around hospital entrances, standing alone, would be valid, as leafletters "would

still be able to approach individuals outside of the fifteen-foot radius in order to distribute

their literature."); *Chicago Acorn*, 150 F.3d at 703–04 (stating that plaintiffs should be

allowed to leaflet at Navy Pier, a non-public forum, but that "[t]he plaintiffs should not be permitted to hand out leaflets in places where pedestrian traffic will be obstructed.")

26. These cases indicate that leafletting restrictions may be reasonable when they are designed to protect unhindered ingress, egress, or traffic flow. In this case, however, the Arena sidewalk contains two sprawling areas for entrance, including the East Gate of 18,746 square feet, and the West Gate of 10,560 square feet. Undisputed Facts, ¶¶ 9, 10. In addition, there is a connecting sidewalk between them of approximately 30 feet wide and 321 feet long. April 25, 2016 Hr'g Tr. at 35:2-12; see also Ex. D-C. The barricaded area, by contrast, appears to be at most four feet wide by thirty feet long, stationed along the edge of the Arena. See, e.g., Exs. P-22, P-23.

27. Mr. Sipe, who testified for the Authority, said that the restriction was needed for three purposes: "crowd control," preventing a "blockage issue of people not being able to get in and/or get out of the venue afterwards," and preventing patrons from "hav[ing] to interact with [protestors], if they don't want to." Doc. 52, at 72:25-73:5.

28. While these articulated goals are reasonable, the Authority has not met its burden to "offer[] any justifications or record evidence to support its ban on the distribution of pamphlets alone." ISKCON v. Lee, 505 U.S. at 691. At the April 25, 2016 hearing, Mr. Sipe testified that if protestors were allowed to "roam free," then it could

> Potentially block customers coming to the event events if there are too many protestors out front. Guests would have an issue getting beyond them into the doors. Also we would have to add an exponential amount more security out front to be in that area to make sure that not only are the

21

protestors adhering to the policy but make sure there are no altercations
of any kind with guests who are approaching the building who don't
necessarily want to be discussed with.

Doc. 23 at 38:15-23.

29. Later in his testimony, Mr. Sipe speculated he would need "to add at least 15
to 20 guards just simply for the front area" for each protest. *Id.* at 41:9-10. As it turned out,
Mr. Sipe's estimates were overinflated. In preparing for Ms. Pomicter's protests, the
Authority saw the need to hire only three additional security personnel. Doc. 52 at 93:14-21.
Mr. Sipe, who was present at these protests, did not receive any complaints from patrons
regarding interactions with protestors. Doc. 52 at 90:16-22.

30. Furthermore, the Authority's reservations regarding crowd control are
undermined by video evidence introduced at trial, which clearly shows that the expansive
Arena entrances are wide enough to accommodate leafletters without confining them to a
narrowly barricaded area along the edge of the Arena.

31. As the Supreme Court has instructed, the reasonableness inquiry "must be
assessed in light of the purpose of the forum and all the surrounding circumstances."
*ISKCON v. Lee*, 505 U.S. at 687. Both the East Gate and West Gate are over 10,000
square feet in area; and they are connected by a long sidewalk of over 300 feet in length.
The videos in this case were taken from the East Gate. They show that some patrons were
looking at leafletters from afar, some approached the leafletters, and some walked at a
distance from the leafletters. *See, e.g.,* Exs. P-10, P-23. None of the videos shows that

22

cumbersome congregation of people formed due to open leafletting. Thus, by its sheer width and design, the Arena's sidewalk grounds would be more than able to accommodate peaceful leafletting even if the leafletters were not barricaded along the edge of the Arena.

32. Taking into account the undisputed facts of the sidewalk space available at the Arena, as well as the video evidence of the Plaintiffs' open leafletting activity, the Court finds that allowing leafletters outside of the barricaded area would not cause additional congestion. *Compare Diener*, 232 F. Supp. 2d at 386 (allowing leafletting activity "given the physical characteristics of the museum grounds...[which] are large, including a parking area for 250 cars and another area for recreational vehicles and buses.") *with Hawkins*, 170 F.3d at 1290-91 (upholding a leafleting ban during peak usage hours in a non-public walkway that was "a comparatively narrow corridor [to the airport in *ISKCON*], having a width between 32 and 40 feet."

33. Additionally, the Arena is large enough to hold up to 10,000 people for an event. April 25, 2016 Hr'g Tr. at 38:24-39:1. "A large majority of the audience arrives within an hour" of popular events' start time, and most of them exit "immediately after the event." *Id.* 39:4-8. Thus, the Authority presumably already implements crowd control methods to manage such a large number of patrons. *Cf.* Oral Arg. Tr. at 14:18-22 (Plaintiffs' counsel confirming that they are not challenging the Authority's power to prohibit anyone from interfering with ingress or egress, blocking access to the Arena, harassing patrons, or

approaching patrons who are standing in lines). There is no reason to single out First Amendment activity with implementation of "special" congestion management rules.[1]

34. Veering away from concrete evidence, the Authority speculates that extreme political groups may descend upon the Arena in the future, such as "white nationalist group[s] or the KKK ... [or] Antifa...any of those groups, again, especially, if we had the President or any elected official coming to the venue, that could be quite an issue for us." *Id.* 75:22-76:7; *see also* Doc. 46, Defendant Trial Brief at 29 (arguing that "if the Ku Klux Klan, the Neo-Nazis, the Antifa, or any other group wants to use this sidewalk for protest ... they would have the same rights as the animal protestors in this case.") But such speculation strains credulity when the Authority has no record of any violent or unruly protests in the past. Mr. Sipe, the Arena's general manager, testified that he has never had any complaints from patrons regarding protestors. Trial Tr. at 90:16-22. Moreover, the Authority retains its power to use ordinary methods of crowd control and to ensure peaceful conduct. *See supra* note 1.

35. Mr. Sipe further testified that there had only been a handful protests in the past decade: Ms. Pomicter's animal rights protests and two Trump rallies in 2016. *Id.* at 87:25-88:1. During the Trump rally in October, a total of four protestors showed up. *Id.* at

---

[1] The Court notes that the Authority retains its power to use ordinary methods of crowd control, including the power to order a large congregation of people to disperse in order to facilitate pedestrian flow; prohibit people from blocking access points or harassing patrons standing in line; prohibit violence or weapons; or alert the police as to fighting or unwanted trespass. Such ordinary crowd control measures, which are applied to patrons and protestors alike, remain available to the Authority and are not affected by the content of this Court's ruling.

102:6-8. In fact, Mr. Sipe testified that other than Ms. Pomicter's protests and Trump rallies, there had only been one other protest at the Arena—an appearance by President George W. Bush in 2004. *Id.* at 92:9-23.

36. Furthermore, if such controversial groups *were* to protest at the Arena, they may likely draw counter-protestors. Mr. Sipe testified that in such a case, both protestors and counter protestors would be confined to the same area, though the area would be expanded as necessary. *Id.* at 96:12-24. If a concern for security risk motivated the protest policies, then the Authority's restriction of all protestors and counter protestors to the same area makes little sense, as the scenario would likely invite discord between the opposing groups.

37. Thus, the Authority's concerns regarding the likelihood of violent protests by extreme political groups are speculative and unsupported by any evidence or logic. *Compare Cornelius*, 473 U.S. at 810 (finding that "the record amply supports an inference that respondents' participation ... jeopardized the success" of a charitable fund-raising drive, when the drive received "approximately 1,450 telephone calls complaining about the inclusion of [protestors]" and there existed evidence of "significant declines in the amount of contributions.") *with United States v. Marcavage*, 609 F.3d 264, 284 (3d Cir. 2010) (finding the government agents' "professedly exclusive motive of hazard avoidance [are] irreconcilably at odds with their admissions that no hazard ever materialized. [Government agent] testified that he observed many people walking along the 6th Street sidewalk and

25

several times described the area around [the protestors] as a choke point ... But importantly, neither [witness] testified in any detail about what Marcavage was specifically doing to block pedestrian traffic despite being afforded ample opportunity to do so.")

38. As for its articulated purpose of maximizing revenue and avoiding loss of patrons, the Authority introduced evidence that it would incur an additional $648 in costs for every four security guards it hires for each event. Ex. D-R. While the Authority hosts around 125 events each year, Doc. 52, at 83:6-7, Mr. Sipe testified that there had only been a handful of protests in the last two years: Ms. Pomicter's animal rights protests, and the Trump rallies. *Id.* at 87:25-88:1. For the former, the Arena hired three additional security personnel for the protests. *Id.* at 93:14-21. As to the latter, the Authority incurred no additional expense, since the secret service provided security for the events. *Id.* at 101:15-102:8.

39. Thus, common sense would not dictate that the Authority would bear significant additional costs if leafletters are allowed beyond barricaded areas, since the Authority would not anticipate protests at most of the Authority's events, which are sporting events or family events. *Id.* 66:1-8. In any case, the Authority always hires security and two law enforcement officers for each event, even if the protestors were confined to the barricaded area. *See e.g.* Trial Tr. at 75:13-15 ("We do have Wilkes-Barre Township Police present at all our events outside the gates."); *id.* at 94:24-95:2 ("Q. What happens when

someone fights in front of the Arena? A. We have security outside, we also have two law enforcement officers from Wilkes-Barre Township Police.")

40. The question is whether there would be any *additional* costs to the Authority if it allowed protestors to leaflet freely rather than confining them to the barricaded areas. If truly controversial and divisive groups chose to protest at the Arena, the Authority would presumably incur high security costs even if the protestors were confined to a barricaded area, particularly if counter-protestors were confined to the same designated area. In other words, common sense inferences do not "provide a way of tying the limitation on speech to the forum's purpose" in this case. *NAACP*, 834 F.3d at 445.

41. As *ISKCON v. Lee* instructs, a restriction on First Amendment rights will still be struck down if "the record contains no information from which we can draw an inference that would support its ban." 505 U.S. at 692. No such inferences may be drawn from the record before the Court. The most illuminating information in the record, i.e. the video evidence of actual protests at the Arena, shows that Plaintiffs leafletted openly and peacefully at their 2016 protest, and did not cause any issues or problems for the Arena. Exs. P-10, P-23.

42. On the other side of the balance, the restriction severely curtails protestors' First Amendment rights. Both Ms. Pomicter and Mr. DeRose testified that they were "barely noticed" by the patrons, that the patrons standing in line near the protestors "were not even looking over at [them]," and that perhaps "one or two" approached the protestors inside the

27

barricaded areas to take leaflets from them. *Id.* 9:7-10; 50:12-21, 51:2-4. The video evidence also shows that protestors behind the barricades were largely ignored by patrons or blocked from view. *See, e.g.,* Ex. P-22.

43. Thus, the record does not suggest that the leafletting restriction is a reasonable way to curtail congestion or prevent loss of revenue. Nor can the Court find that common sense would raise such an inference. The leafletting restriction imposed by the Authority, which sequesters leafletters to barricaded areas along the edges of the Arena, unreasonably impinges on Plaintiffs' First Amendment rights.[2]

### The Voice Amplification Ban

44. The Revised Protest Policy also states that "[n]o artificial voice amplification is permitted." Ex. D-H. Generally, "amplified speech, such as through the use of bullhorns, is protected expression." *Startzell v. City of Philadelphia*, 533 F.3d 183, 199 n. 10 (3d Cir. 2008) (citing *Stokes v. City of Madison*, 930 F.2d 1163, 1168–69 (7th Cir. 1991)).

45. However, content-neutral restrictions on noise amplification may be reasonable if there is sufficient evidence that the voice amplification was disruptive. In *Startzell*, the Third Circuit held that the "police had ample justification to direct Appellants to move when they interfered with the permitted event's activities by expressing their message with loud bullhorns right next to the main stage where musical performances were held,

---

[2] Because the corresponding Pennsylvania constitutional provision "provides protection for freedom of expression that is broader than the federal constitutional guarantee," the restriction is equally unreasonable under Pennsylvania law. *Pap's A.M. v. City of Erie*, 571 Pa. 375, 399, 812 A.3d 591 (Pa. 2002) (internal citation and quotation marks omitted).

directly confronting a transgendered individual, and blocking access to the vendors who had applied for booths at OutFest." *Startzell*, 533 F.3d 183, 199 (3d Cir. 2008)

46. *Startzell* concerned a traditional public forum, therefore the government's restrictions would have been subject to even higher scrutiny than it would be in this case, which concerns a nonpublic forum. Yet, even the *Startzell* case found that government action in curtailing usage of bullhorns was "justified." *See id.* ("Because Appellants were interfering with the permitted event's message, something the other OutFest attendees were not doing, the police officers were justified in directing Appellants' movement away from the stage and the vendors.") (internal citation omitted).

47. Thus, the concern that bullhorns may interfere with—or "drown out"—permitted speakers on site is a legitimate one, for which the government may impose reasonable restrictions. *Id.* (citing video evidence of protestors who "used bullhorns and microphones in an attempt to drown out the platform speakers and then, most significantly, congregated in the middle of the walkway.")

48. At trial, Mr. Sipe testified that the voice amplification ban is necessary to protect vendors at the Arena, who "sometimes" sell merchandise outside; he opined that "any voice amplification that would be louder than [the vendors'] would, obviously, inhibit that sale," and that if the protestors' amplification was "loud enough," it could "interfere with what's going on inside the venue." Doc. 52, at 64:23-65:2. He also opined that voice amplification may interfere with Arena announcements over the outdoor sound system

regarding "policies for guests...security issues...and what's allowed inside the venue." *Id.* at 65:3-6.

49. The evidence introduced at trial does not show any such vendors on site during Ms. Pomicter's protests, the Court is thus without concrete evidence as to whether the area of the Arena sidewalk may accommodate both protestors and vendors' voice amplifications without mutual interference. Ms. Pomicter, however, testified at trial that during the seven years that she has protested at the Arena, she had "only seen the Ringling Circus, maybe once, maybe twice, come out and try to sell their wares...so it's very seldom." Doc. 52, at 33:3-6. She further testified that if there had been vendors during her protests, she would "hold off using our amplification for the 15 minutes they're there." *Id.* at 33:1-2. *See also* Oral Arg. Tr. at 59:1-9 ("[T]he current policy does not say you cannot use amplification when it would conflict with [the Arena's] amplification....If it were changed to say that, then, [plaintiffs] would drop [their] objection to it.")

50. Plaintiffs are bringing a facial challenge to the Revised Protest Policy. *See* Doc. 1, ¶¶ 26-28; Oral Arg. Tr., at 16:1-3 (plaintiffs averring that they are bringing "a facial challenge to this policy. Quite literally, what we're asking for is the policy, as written, is unconstitutional."). In its current state, the Revised Protest Policy includes a wholesale ban on all "artificial voice amplification" for First Amendment activity. Ex. D-H. Given the broad and encompassing area of the Arena sidewalk and the seldom usage of voice amplification by the vendors, the Court finds such a sweeping ban on noise amplification to be

30

unreasonable. The only evidence that the Authority has offered to justify the ban is that protestors' use of noise amplification *may* interfere with Arena announcements or sales merchants' use of noise amplification. Doc. 52, at 64:23-65:2. To the extent such interference occurs, the Authority is free to craft a more tailored rule requiring protestors to refrain from noise interference for the duration of nearby vendors' use of voice amplification or Arena announcements.

### The Profanity and Vulgarity Ban

51. The Revised Proposed Policy also includes a blanket ban on "[a]ny promotional verbiage suggesting vulgarity or profanity." Ex. D-H. The Policies do not otherwise define "vulgarity" or "profanity," nor did the Arena offer a concrete definition at trial, though Mr. Sipe implicitly equated profanity with "cursing or any type of foul language"; he also opined that public nudity would be "vulgar" under the Revised Proposed Policy. Trial Tr. at 65:10-11, 66:22-24.

52. Government censorship that aims to avoid controversy should be scrutinized especially carefully, as "this objective is nebulous and not susceptible to objective verification." *NAACP*, 834 F.3d at 446. *See also Cornelius*, 473 U.S. at 812 ("[T]he purported concern to avoid controversy excited by particular groups may conceal a bias against the viewpoint advanced by the excluded speakers.")

53. The Authority has prohibited "any promotional verbiage suggesting vulgarity or profanity" and any "use of profanity," without defining either term or providing any

31

examples. The Revised Protest Policy is therefore at risk for becoming an overbroad prohibition that would give the Authority pretext to ban speech based on viewpoint any time it wishes to censor the speech at issue.

54. In a nonpublic forum, the government may impose content-based restrictions "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806. Content-based restrictions may limit speech to "a particular subject," but "must allow for the expression of all viewpoints on that subject." *NAACP*, 834 F.3d at 446 (citing *Cornelius*, 473 U.S. at 806).

55. There is no doubt that the ban is at least content-based, as it prohibits a specific type of speech—this is so despite the fact that the ban would apply to any speaker who uttered vulgar or profane speech. "[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230, 192 L. Ed. 2d 236 (2015).

56. Though the parties do not argue the point, the ban likely constitutes viewpoint discrimination as well. The Supreme Court recently held that the disparagement clause of the Lanham Act, which prohibited trademarks that might disparage "every person living or dead as well as every institution," was "far too broad" and constituted impermissible viewpoint discrimination. *Matal v. Tam*, 137 S. Ct. 1744, 1765, 198 L. Ed. 2d 366 (2017). In fact, the Court said that a purported interest in "preventing speech expressing ideas that

32

offend…strikes at the heart of the First Amendment." *Id.* at 1764. On the issue of viewpoint discrimination, the Court reasoned:

> Our cases use the term "viewpoint" discrimination in a broad sense, and in that sense, the disparagement clause discriminates on the bases of "viewpoint." To be sure, the clause evenhandedly prohibits disparagement of all groups … It denies registration to any mark that is offensive to a substantial percentage of the members of any group. But in the sense relevant here, that is viewpoint discrimination: *Giving offense is a viewpoint.*

*Id.* at 1763 (emphasis added) (internal citation omitted).

57. But the Court need not reach the question of whether the profanity and vulgarity ban constitutes viewpoint discrimination as well as content-based restriction. In light of recent Third Circuit and Supreme Court guidance on the need to tolerate even offensive or disagreeable speech, the Court finds the vulgarity and profanity ban to be overbroad. Far-reaching censorship like this one, even if it arises from good-faith motives, is at risk of selective enforcement, "as future government officials may one day wield such statutes to suppress disfavored speech." *Reed*, 135 S. Ct. at 2229.

58. In *NAACP*, the Third Circuit found that a selective ban of offensive messages in certain mediums—while allowing other mediums to post the same type of messages— was unreasonable even in a nonpublic forum. Specifically, the Court held that an airport cannot restrict advertising in order to keep "travelers from seeing potentially offensive noncommercial content," especially when it allowed television broadcasting shows and newsstands to display "the very types of non-commercial information that the City seeks to

exclude from its advertising space." 834 F. 3d at 446-47. In so holding, the Court

reasoned:

> [T]here is little logic to the inference the City asks us to draw. Although
> we have no reason to doubt that the City does try to maintain a 'soothing
> and pleasing' environment in the Airport, that broader effort apparently
> does not involve shielding travelers from noncommercial content on the
> ground that it might offend them. Instead, the Airport exposes them to an
> onslaught of noncommercial content outside of its advertising space
> without any suggestion that doing so is inconsistent with the environment
> it seeks to foster.

*Id.* at 447.

59. The Arena hosts many forms of entertainment events. Common sense would

dictate that profanity would as likely to arise from rival team fans at a sporting event as from

animal rights protestors. If the Authority is prepared to ban all permitted guests for using

profanity at all events, including fans at sporting events, it may do so by implementing an

Arena-wide policy that applies to patrons and protestors alike. However, on its face, the

Revised Protest Policy only applies to protestors wishing to express their views at the

Arena. Ex. D-H. There is no evidence of an analogous ban that applies to patrons or other

permitted guests of the Arena. Thus, based on the record adduced at trial, the Revised

Protest Policy unreasonably singles out First Amendment activity by imposing a blanket

voice amplification ban on protestors alone.

60. In its trial brief, the Arena attempts to place the profanity and vulgarity

prohibition under the "fighting words" exception to the First Amendment. Doc. 46, at 31-32

(citing *Chaplinsky v. State of New Hampshire*, 315 U.S. 568 (1942)). But "[t]he unprotected

category of speech called 'fighting words' is an extremely narrow one." *Johnson v. Campbell*, 332 F.3d 199, 212 (3d Cir. 2003). "The First Amendment on the whole offers broad protection for speech, be it unpleasant, disputatious, or downright offensive." *Id. See also Marcavage*, 609 F.3d 264, 282 ("in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.") (citing *Boos v. Barry*, 485 U.S. 312, 322, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988)). "To be punishable [as fighting words], words must do more than bother the listener; they must be nothing less than 'an invitation to exchange fisticuffs.'" *Campbell*, 332 F.3d at 212 (citing *Texas v. Johnson*, 491 U.S. at 409).

61. The record before the Court indicates that the vulgarity ban is not aimed at curbing "fighting words" so much as words that may make the listener uncomfortable. *See, e.g.,* Trial Tr. at 65:10-23 ("We just don't feel our customers should be subjected to cursing or any type of foul language ... [profanity] could cause guests not to come back to our venue if they believe they're going to be subjected to that on their way in...") However, potential discomfort alone does not elevate offensive speech to "fighting words."

62. In *United States v. Marcavage*, 609 F.3d 264 (3d Cir. 2010), the Third Circuit confronted similar facts to this case. Though *Marcavage* concerned a traditional public forum, its analysis with respect to vulgarity is illuminating for present purposes. The record in *Marcavage* reflected that "Liberty Bell visitors and pedestrians were disturbed by and complained about Marcavage's preaching and the graphic images on the signs displayed by

35

Marcavage's group," and that the government was "concerned by visitors' reactions to that message and those signs; and thought it unfair that those individuals were being subjected against their will to listening to that message and viewing those signs." *Marcavage*, 609 F.3d at 283.

63. The same concerns are cited by the Authority. For example, Mr. Sipe testified that the vulgarity ban's primary purpose is to avoid offending patrons. Doc. 52, at 66:9-16 ("[V]ulgarity is anything that's obscene or lewd, and we don't feel that if our guests are coming to an event, they should be subjected to that, as they're coming in, especially, if it's not an event -- especially, if it is an event that's targeted for families."). But as *Marcavage* cautioned: "'[s]peech cannot be ... punished or banned[ ] simply because it might offend' its audience." *Marcavage*, 609 F.3d at 283. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Id.* at 282 (citing *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)).

64. The question is certainly a closer one when the forum is nonpublic, where reasonable restraints on speech may be permitted. For example, the Third Circuit in *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 281 (3d Cir. 2004) held that a township could restrict "the discussion to topics of public interest" in a limited public forum and remove a speaker for "his badgering, constant interruptions, and disregard for the rules of decorum." But the forum there was a town hall meeting, a forum the government

designated for limited discussion of "matters pertaining to town government." *Id.* at 281.
Here, the Authority has explicitly designated its sidewalk for First Amendment activity. *See*
Ex. D-H ("All persons are welcome to express their views at the Mohegan Sun Arena at
Casey Plaza.") Furthermore, the record in *Eichenlaub* contained concrete evidence of the
speaker's disruptiveness while he attempted to speak about "matters of private concern," a
topic that had never been permitted at the township meetings. *Id.*

65. By contrast, the record in this case does not contain evidence of profanity or
vulgarity causing disruptiveness or physical violence. When one of Ms. Pomicter's
protestors wore a shirt with a profane word on it, Mr. Sipe alerted Ms. Pomicter to the fact
and the protestor promptly zipped up her jacket such that the word was no longer showing.
Trial Tr. at 66:19-24. Ms. Pomicter testified that it was "the first time" she's encountered
such a problem. *Id.* at 13:13-14. Furthermore, both Ms. Pomicter and Mr. DeRose said that
they do not use profanity while protesting, finding it "counterproductive." *Id.* 14:5-8; 55:4-14.
Finally, some of the video evidence shows one patron making an obscene gesture toward a
protestor (raising the middle finger), but he was ignored by other patrons and the protestors,
creating no issue for the Arena security at all. *Id.* 14:19-22; Ex. P-16.

66. To bolster support for the vulgarity ban, Mr. Sipe speculates that other
instances of vulgarity could occur at the Arena, offering the example of an animal rights
protestor who was only covered in body paint at a protest in Downtown Wilkes-Barre. *Id.*
66:19-24. However, this is conjecture on Mr. Sipe's part. The people who actually have

protested at the Arena in the last few years testified that they do not use profanity at protests. *Id.* at 14:5-8, 55:4-14. There is no evidence on the record that profanity or vulgarity is an existing problem of the Arena's protests in need of remedy.

67. The non-speculative evidence presented on this issue included only a profane word printed on a protestor's T-shirt and a patron's usage of a rude hand gesture. There is no reason to conclude that either expression were likely to have prompted violence from protestors or patrons of the Arena. These two incidents can hardly qualify as "fighting words" undeserving of First Amendment protection. It is reasonable to infer from the record that these past incidents would be the best indicator of what the Authority may expect for future protests. Without more concrete evidence, the Arena cannot justify its broad ban based on speculation of violence that may be incited by profanity. Again, because Plaintiffs are bringing a facial challenge to the Revised Protest Policy (*see, e.g.,* Oral Arg. Tr., at 16:1-3), the Revised Protest Policy's prohibition of vulgarity and profanity, as it is currently written, impermissibly restricts protestors' First Amendment rights.

## IV. Conclusion

For the foregoing reasons, the Court will enter judgment in favor of Plaintiffs. A separate Order of Judgment follows.

Robert D. Mariani
United States District Judge

38