THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SILVIE POMICTER and
LAST CHANCE FOR ANIMALS

      Plaintiffs,

v.

LUZERNE COUNTY CONVENTION
CENTER AUTHORITY and
SMG

      Defendants.

3:16-CV-00632
(JUDGE MARIANI)

## SUPPLEMENTAL MEMORANDUM OPINION

### I. Introduction

This action involves a First Amendment challenge to government restrictions on protesting activity in a non-public forum. On April 10, 2018, after a bench trial, this Court concluded that the Defendants' leafletting restriction, voice amplification ban, and profanity or vulgarity ban, as reflected in the Defendants' Protest Policy, violate First Amendment principles. Doc. 59 ("Bench Op."). Accordingly, the Court entered judgment in favor of Plaintiffs. Doc. 60. On May 2, 2018, Plaintiffs filed a motion for additional findings of fact and law and to amend the judgment under Federal Rules of Civil Procedure 52(b) and 59(e). Doc. 66. Plaintiffs motion seeks to amend the Court's April 10, 2018 Order to include additional findings of fact and law supporting Plaintiffs' right to not only leaflet outside designated barricaded areas, but also carry signs outside of those areas. The Court

assumes the parties' familiarity with the facts of this case and its previous opinion. Thus, this memorandum will specifically address the issue of whether protestors carrying signs should be confined to designated barricaded areas at the Mohegan Sun Arena (the "Arena").

## II. Findings of Fact

1. As the Court found in its previous opinion, Plaintiffs Sylvie Pomicter and Last Chance for Animals regularly protest outside businesses and venues to promote animal rights. Bench Op. ¶¶ 1-2 (citing Stipulated Facts for Trial ¶ 12, 16).

2. The Court also found that the Arena is a stadium that is designated for public recreational use, and frequently hosts entertainment or sporting events, such as concerts, the Circus, sporting events, or other entertainment events. *Id.* ¶¶ 14-15 (citing Stipulated Facts for Trial ¶ 2 and April 25, 2016 Hr'g Tr. at 36:25-37:4).

3. Patrons attending events at the Arena arrive primarily by car, and then proceed on foot to one of the two entrances known as the East and West Gates. *Id.* ¶ 16 (citing Ex. P-7 ¶ 5).

4. The total square footage of the concrete in front of the East Gate is 18,746 square feet. *Id.* ¶ 18 (citing Stipulated Facts for Trial ¶ 9).

5. The total square footage of the concrete in front of the West Gate is 10,560 square feet. *Id.* ¶ 19 (citing Stipulated Facts for Trial ¶ 10).

6. A sidewalk connects the East and West gates and is approximately 30 feet wide and 321 feet long. *Id.* ¶ 22 (citing April 25, 2016 Hr'g Tr. at 35:2-12 and Ex. D-C).

7. The sidewalk is generally open to the public, although it is primarily used for individuals attending events at the Arena or purchasing tickets to upcoming events. *Id.* ¶ 23 (citing April 25, 2016 Hr'g Tr. at 37:5-10).

8. The Arena is large enough to hold up to 10,000 people for an event. *Id.* ¶ 24 (citing April 25, 2016 Hr'g Tr. at 38:24-39:1).

9. In March 2016, Defendants implemented the Revised Protest Policy to include two barricaded protest areas located along the edges of the East and West Gates. *Id.* ¶ 27 (citing April 25, 2016 Hr'g Tr. at 31:22-23; 32:1-21 and Ex. D-H). The protest areas would be able to be expanded depending on the number of protestors. *Id.*

10. The Revised Protest Policy states "All persons are welcome to express their views at the Mohegan Sun Arena at Casey Plaza." Ex. D-H.

11. The Revised Protest Policy further states that all protestors "are to be within the designated area outside [of] the East & West Gate," and that "[h]andouts can only be distributed from within [the] designated area." Ex. D-H. It does not specifically mention the display of signs or banners. *Id.*

12. During Plaintiffs' protests at the Arena in 2016, the designated barricaded area at the East Gate was a small, rectangular enclosure constructed from bike racks. The enclosure was set against the edge of the East Gate fence. Protestors inside the

3

barricaded area stood facing patrons in a single line. Bench Op. ¶ 39 (citing Trial Tr. at 7:18-23 and Exs. P-10, P-16, P-17, P-22, P-23 ("Video Clip Exhibits")).

13. Both Ms. Pomicter and Mr. DeRose testified that the protesters in the barricaded areas drew very little attention from the approaching patrons. *Id.* ¶ 40 (citing Trial Tr. at 9:7-10, 47:7-14, 50:12-21, 51:2-4). They testified that they were "barely noticed" by the patrons, and that the patrons standing in line near the protestors "were not even looking over at us." *Id.*

14. Video clips introduced at trial showed that there were about 20 to 30 feet between the barricaded area and the nearest line of patrons who were waiting in line for ticket sales. Bench Op. ¶ 41 (citing Ex. P-22). There were several lines of patrons for ticket sales in the area, and the line of patrons closest to the barricaded area blocked the view of patrons from other lines from being able to see the protestors. *Id.* (citing Trial Tr. 10:16-11:1; 48:16-19).

15. During the Plaintiffs' protests in 2016, the protesters in the barricaded area were crowded together, and standing "shoulder to shoulder." Trial Tr. 48:9-15. *See also* Ex. P-22.

16. During the bench trial, Brian Sipe, the Arena's general manager, testified that the designated areas for protestors serve to prevent crowd congestion, prevent patrons from "hav[ing] to interact with [protestors]," manage "security risk[s]" arising from potential

confrontations between patrons and protestors, and prevent loss of revenue and goodwill from patrons. Bench Op. ¶ 48 (citing Trial Tr. 72:22-73:5; 74:16-22).

17. Mr. Sipe testified that no patron has complained to him about any interactions with protestors, nor is he aware of any complaints to the Arena about protestors. *Id.* ¶ 51 (citing Trial Tr. at 90:16-22).

18. The Arena has always had the authority to ban weapons, body armor, open flames, fighting, inciting violence, and making threats. *Id.* ¶ 52 (citing Trial Tr. at 94:5-95:11). Further, the Arena has security guards and two law enforcement officers from Wilkes-Barre Township Police present at all events. If a fight were to occur, the police officers would be able to take necessary legal action. *Id.*

19. The Authority has only designated the sidewalk for expressive activity during events; the area is not designated for expressive activity during non-event times. *Id.* ¶ 53 (citing Trial Tr. at 95:12-18).

### III. Conclusions of Law

1. Rule 59(e) "permits the filing of a motion to alter or amend a judgment." Fed. R. Civ. P. 59(e). A motion under Rule 59(e) is a 'device to relitigate the original issue' decided by the district court, and used to allege legal error." *United States v. Fiorelli*, 337 F.3d 282, 288 (3d Cir.2003) (citations omitted).

2. Rule 52(b) provides that upon motion by a party, "the court may amend its findings--or make additional findings--and may amend the judgment accordingly." Fed. R. Civ. P. 52(b).

3. "The primary purpose of Rule 52(b) is to enable the appellate court to obtain a correct understanding of the factual issues determined by the trial court as a basis for the conclusions of law and the judgment entered thereon." 9C Charles Wright & Arthur Miller, Federal Practice & Procedure § 2582 (3d 2017). "Normally, parties seek [Rule] 52(b) relief after a bench trial or where summary judgment has been granted." *Gutierrez v. Ashcroft*, 289 F. Supp. 2d 555, 561 (D.N.J. 2003). "The motion is 'not a vehicle for relitigation of issues previously adjudicated.'" *Temple Univ. Hosp., Inc. v. United States*, 2017 WL 2531948, at *4 (E.D. Pa. June 9, 2017) (quoting *Wound Care Ctrs., Inc. v. Catalane*, No. 10-336, 2011 WL 3476612, at *2 (W.D. Pa. Aug. 9, 2011)). However, the standard is similar to a motion for reconsideration or to alter judgment under Rule 59(e)." *Id. See also Gutierrez*, 289 F. Supp. 2d at 561 (noting that "Rule 59(e) relief is substantially similar" to that sought in a Rule 52(b) motion).

4. Because the motion seeks additional findings of facts and law pertaining to an issue not specifically raised by the parties during the bench trial, a Rule 52(b) motion is the more appropriate procedural tool under these circumstances.

5. As the Court previously found, in a non-public forum such as the Arena, the government may restrict access as long as the restrictions are reasonable. Bench Op. ¶ 11.

"The reasonableness of the Government's restriction [on speech in a nonpublic forum] must be assessed in light of the purpose of the forum and all the surrounding circumstances." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 687, 112 S. Ct. 2711, 2712, 120 L. Ed. 2d 541 (1992) (hereinafter "*ISKCON v. Lee*") (citing *Cornelius*, 473 U.S. at 809).

6. When analyzing the reasonableness of speech restrictions, courts may rely on "record evidence or commonsense inferences. First...the evidence or commonsense inferences must allow us to grasp the purpose to which the City has devoted the forum. And second, the evidence or commonsense inferences also must provide a way of tying the limitation on speech to the forum's purpose." *NAACP v. City of Philadelphia*, 834 F.3d 435, 445 (3d Cir. 2016). The Arena must provide at least "a legitimate explanation for the restriction," whether based on record evidence or common sense. *Id.*

7. The Revised Protest Policy confines "all participants" to "the designated area outside [of] the East & West Gate." Ex. D-H. Plaintiffs argue that similar to the leafletting restriction, the restriction of confining protestors who are displaying signs to barricaded areas is unreasonable because both activities are passive activities that "do not require patrons to stop." Doc. 67 at 3.

8. In its previous opinion, the Court found confining leafletting activity to a small enclosure along the edges of the otherwise expansive Arena area to be unreasonable. Bench Op. ¶¶ 15-43. Specifically, Supreme Court jurisprudence has delineated a clear line between leafletting, a passive activity that "does not require that the recipient stop in order

7

to receive the message the speaker wishes to convey," and solicitation, which "disrupts passage and is more intrusive and intimidating than an encounter with a person giving out information." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 690, 112 S. Ct. 2711, 2713-14, 120 L. Ed. 2d 541 (1992) (citing *United States v. Kokinda*, 497 U.S. 720, 721, 110 S. Ct. 3115, 3117, 111 L. Ed. 2d 571 (1990)).

9. Based on the fact that the Arena's sidewalk "contains two sprawling areas for entrance, including the East Gate of 18,746 square feet, and the West Gate of 10,560 square feet," as well as "a connecting sidewalk between them of approximately 30 feet wide and 321 feet long," and based on the video evidence introduced at trial, which showed that "the expansive Arena entrances are wide enough to accommodate leafletters without confining them to a narrowly barricaded area along the edge of the Arena," the leafletting restriction was found to be facially unreasonable. Bench Op. ¶¶ 26, 30.

10. The Court finds that the reasoning of permitting leafletting activity applies with equal force to the act of carrying signs and picketing. The display of signs is just as unobtrusive—if not more so—than the act of handing out literature to passerby. *See generally United States v. Grace*, 461 U.S. 171, 176, 103 S. Ct. 1702, 1706, 75 L. Ed. 2d 736 (1983) ("There is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment.") (collecting cases).

11. The Authority opposes this motion because "if confrontation occurred between customers and the protestors, the signs could be used intentionally to harm someone." Doc. 69 at 2. However, concerns of security risk have already been addressed in this Court's previous opinion in the context of analyzing the leafletting restriction.

12. In particular, the Court considered the testimony of Mr. Sipe, who stated the Authority's concern for potential security issues, especially if more extreme political groups than Plaintiffs were to show up at the Arena, such as the KKK or white nationalist groups. The Court found references to these extremist groups protesting at the Arena to be untenable speculation. Bench Op. ¶ 34.

13. Moreover, the Court noted in its previous opinion that Mr. Sipe *had* been present at a potentially controversial political event, i.e. a campaign rally with then-presidential candidate Donald Trump on October 10, 2016. At the rally, then-candidate Trump's supporters were permitted to carry signs outside the entrances of the Arena and outside the designated barricaded areas. Trial Tr. 89:21-25. There was no evidence that the fact certain people were permitted to carry signs on the Arena sidewalks promoted any violence or traffic congestion.

14. Mr. Sipe also testified that both protestors and counter protestors would be confined to the same barricaded area, though the area would be expanded as necessary. Trial Tr. at 96:12-24. As the Court previously found, if security is a concern for the Arena during protesting activity, then the Authority's policy of confining all protestors and counter-

protestors to a barricaded area makes little sense, as the sheer proximity may increase the risk of confrontation and clashes between groups. Bench Op. ¶ 36.

15. The Court recognizes that there is always a risk of violent confrontation between protestors and customers at government-operated forums. But in the circumstances presented here, the Court finds it unlikely that there would be any significant increase in risk by permitting protestors to carry signs freely as opposed to confining them to a narrow strip along the edges of the Arena. This finding is supported by the evidence presented at trial, including the Arena's own general manager' testimony that he "has never had any complaints from patrons regarding protestors." Trial Tr. at 90:16-22 (Brian Sipe testifying that no patron has complained to him about any interactions with protestors, nor is he aware of any complaints to the Arena about protestors).

16. More importantly, the Court's previous opinion noted that the Arena retains its authority to enforce ordinary police power and other crowd control methods, such as prohibiting violence or weapons or alerting the police as to fighting or unwanted trespass, emphasizing that "ordinary crowd control measures, which are applied to patrons and protestors alike, remain available to the Authority and are not affected by the content of this Court's ruling." Bench Op. ¶ 33 n. 1.

17. Thus, there is no reason to infer from the record that permitting protestors to carry signs outside the barricaded areas would be any more prone to violence than permitting leafletting. Furthermore, the Court reiterates that the Authority retains its ordinary

police power, and thus would have ample recourse for preventing the escalation of violence, should any arise.

18. Defendants also oppose this motion by arguing that allowing protestors "to intermingle with the Arena's customers as they enter and exit the building in large numbers right before and after an event at the Arena will expose them to the risk of accidental injury from the signs," and that a large number of customers tend to "arrive right before the beginning of an event or...all leav[e] at once." Doc. 69 at 2-3. However, as the Court previously held, the Arena's sheer expansive space means that protestors may stand in various parts of the Arena without blocking traffic flow. Specifically, the Court's rulings in no way disturbed the Authority's power to prohibit people from interfering with ingress or egress, blocking access to the Arena, harassing patrons, or approaching patrons who are standing in lines. Bench Op. ¶ 33.

19. Defendants also point out that messages on signs "can be communicated from the designated areas which can be viewed by the Arena's customers as they enter and exit the building." Doc. 69 at 4. While this may be true, video evidence adduced at trial show that the designated areas were set up such that protestors "stood facing patrons in a single line," and there were at least "several lines of patrons for ticket sales in the area, [with] the line closest to the barricaded area blocking the view of patrons from other lines being able to see the protestors." Bench Op. ¶ 41 (citing Trial Tr. at 10:16-11:1; 48:16-19). Further, Plaintiffs testified that "they were 'barely noticed' by the patrons" and that even

patrons standing in line near the protestors "were not even looking over at us." *Id.* ¶ 40 (citing Trial Tr. 9:7-10; 50:12-21, 51:2-4). Thus, the policy of confining protestors to a narrow area along the edge of the Arena clearly had a negative impact on the protestors' First Amendment rights to convey their message through signage.

20. In any event, Plaintiffs' brief in support of the instant motion concedes that for large signs, "the Arena could direct such persons to stand at the edge of the pedestrian path, particularly along the 30 foot wide sidewalk that extends between the East and West Gate, or to the side where the protest enclosures were placed during the 2016 and 2017 circus protests." Doc. 67 at 4-5. This is consistent with the Court's findings that the Authority may redirect protestors to another part of the Arena sidewalks, which contains more than ample space. The two entrances each consists of more than 10,000 square feet in space, with a connecting sidewalk between them, which is over 300 feet long and 30 feet wide. Bench Op. ¶ 31. Thus, protestors carrying signs could be accommodated without disrupting the Arena's traffic flow in the same way that leafletting activity may be accommodated.

21. Similar to the Authority's retention of its police power, the previous opinion also emphasized that the Authority maintains its power to engage in crowd control, "including the power to order a large congregation of people to disperse in order to facilitate pedestrian flow; prohibit people from blocking access points or harassing patrons standing

in line; prohibit violence or weapons; or alert the police as to fighting or unwanted trespass."
*Id.* ¶ 33 n. 1.

22. The Court agrees with Defendants that crowd control may present a significant issue when a stadium's audience exits *en masse* around the same time period. As the Third Circuit stated in *Int'l Soc. for Krishna Consciousness, Inc. v. New Jersey Sports & Exposition Auth.*, 691 F.2d 155 (3d Cir. 1982):

> Finally, the Authority's policy plays an important role in maintaining traffic and crowd control. Bringing 75,000-85,000 people into the stadium for a game and dispersing them quickly afterwards is no mean feat. It is essential that people move rapidly and with a minimum of interruptions as they stream through the parking lot and stadium. Stopping patrons to solicit contributions, accept money, make change, and distribute literature would impede that necessary free movement. *Id.* at 162.

23. However, *New Jersey Sports & Exposition's* analysis, which primarily revolves around the difference between solicitation and other more passive activities, shows that the question of crowd control must be put into context of the protest activity at issue. The more intrusive the activity, the less deference will be accorded to it in the face of greater concerns, such as crowd control. In the analysis quoted above, the Third Circuit found that solicitation, which necessitates the stopping of patrons and asking them for money and make change, to be a potential impediment to traffic flow. As this Court noted in its previous opinion, *New Jersey Sports & Exposition* was decided before the Supreme Court's distinction between leafletting and solicitation in *ISKCON v. Lee*, but the more

13

general principles remain sound—crowd control may be an important interest of the Authority, but its manner of implementation must make sense in the context of the case.

24. In this case, given the Arena's expansive and unique layout, the Court reaffirms its previous reasoning that problems of congestion for the Authority will not be significantly exacerbated by simply allowing protestors to carry signs freely. On the other hand, there has been evidence adduced at trial that Plaintiff's First Amendment rights to carry signs and communicate their message were curtailed by their confinement to a narrow barricaded area along the edge of the Arena. *See, e.g.,* Bench Op. ¶¶ 39-41.

25. Thus, the Court finds that there is no reason to treat leafletting activity and the carrying of signage differently in this context, especially since the Authority may redirect any protestors carrying signage to facilitate traffic flow or to eject protestors for violence. As the Supreme Court has found, "confrontation by a person asking for money disrupts passage and is more intrusive and intimidating than an encounter with a person giving out information. One need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand, but one must listen, comprehend, decide, and act in order to respond to a solicitation." *Kokinda*, 497 U.S. at 734. Similar to leafletting, the passive activity of carrying signs does not demand engagement or stopping from the Authority's customers. So long as protestors are not obstructing traffic flow, a customer "need not ponder the contents" of their signs before moving to their desired destination.

26. For reasons stated above, Defendants shall be enjoined from confining protestors carrying signage to a narrow barricaded area. The Court's ruling is without prejudice to the Defendants' authority to implement ordinary crowd control methods and police power as applied to protestors and patrons alike, including the power to relocate people in order to facilitate pedestrian flow; prohibit people from blocking access points or harassing patrons; prohibit violence or weapons; or alert the police as to fighting or unwanted trespass.

## Conclusion

27. For the foregoing reasons, Plaintiffs' motion to amend the judgment (Doc. 66) will be granted in accordance with the guidance above. A separate Amended Order of Judgment follows.

_____
Robert D. Mariani
United States District Judge