THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SILVIE POMICTER,  et al.,                       :
                                                :          CIVIL ACTION NO. 3:16-CV-632
              Plaintiffs,                       :          (JUDGE MARIANI)
                                                :
       v.                                       :
                                                :                       FILED
                                                :                     SCRANTON
LUZERNE COUNTY CONVENTION                        :
CENTER, et al.,                                 :                  OCT 2 6 2021
                                                :
              Defendants.                       :          Per_____
                                                              DEPUTY CLERK

## MEMORANDUM OPINION
### I. INTRODUCTION

Upon remand from the Court of Appeals for the Third Circuit, the Court now

considers the narrow issue of whether the Mohegan Sun Arena's "policy sequestering

protesters to designated areas . . . passes muster under the Pennsylvania Constitution,"

*Pomicter v. Luzerne County Convention Center Authority*, 939 F.3d 534,548-49 (3d Cir.

2019).  The remand is based on the Circuit Court's disagreement with this Court's finding

that

> the record does not suggest that the leafletting restriction is a reasonable way
> to curtail congestion or prevent loss of revenue.  Nor can the Court find that
> common sense would raise such an inference.  The leafletting restriction
> imposed by the Authority, which sequesters leafletters to barricaded areas
> along the edges of the Arena, unreasonably impinges on Plaintiffs' First
> Amendment rights.

(Doc. 59 at 28, Conc. of Law ¶ 43.)  Related to this conclusion of law, the Court noted that

"[b]ecause the corresponding Pennsylvania constitutional provision 'provides protection for

freedom of expression that is broader than the federal constitutional guarantee,' the restriction is equally unreasonable under Pennsylvania law." (Doc. 59 at 28 n.2. (quoting *Pap's A.M. v. City of Erie*, 571 Pa. 375, 399, 812 A.3d 591 (Pa. 2002) (internal citation and quotation marks omitted). Therefore, the Court did not separately address whether the policy of sequestering protesters violated Plaintiffs' rights under the Pennsylvania Constitution.[1]

Following remand, the Court held a telephone conference at which the parties agreed that briefing on the Pennsylvania Constitution issue was appropriate. (*See* Doc. 81 at 1.) The parties have now fully briefed the issue, and the matter is ripe for disposition. For the reasons that follow, the Court concludes that sequestering protesters who are distributing literature and carrying signs to barricaded protest areas does not violate Plaintiffs' rights under the Pennsylvania Constitution.

## II. BACKGROUND

This action involves a challenge to the government's restrictions on protesting activity in a non-public forum under the First Amendment and Article 1, Section 7 of the Pennsylvania Constitution. On April 15, 2016, Plaintiffs Silvie Pomicter and Last Chance for Animals ("Plaintiffs") filed their Verified Complaint against Defendants Luzerne Country Convention Center Authority (the "Authority") and SMG ("SMG" and, together with the

---

[1] With the Supplemental Memorandum Opinion and Amended Judgment and Order, the Court extended its findings and conclusions regarding leafletting to include protesters' right to carry signs outside of the restricted areas. (*See* Docs. 70, 71.)

Authority, "Defendants"), alleging that Defendants' policies and practices violate the First Amendment and Article 1, Section 7. (Doc. 1.) In particular, Plaintiffs sought both declaratory and injunctive relief prohibiting Defendants from enforcing their policy of (1) confining all leafletting and protesting activity to barricaded designated areas on the sidewalk outside of the Mohegan Sun Arena (the "Arena"), (2) prohibiting use of voice amplification by protestors, and (3) prohibiting use of profanity and vulgarity by protestors. (Id.)

On April 15, 2016, Plaintiffs filed a motion for preliminary injunction. (Doc. 2.) The Court held an evidentiary hearing on April 25, 2016, and, on April 27, 2016, issued a Memorandum Opinion and Order granting Plaintiffs' motion as modified. (Docs. 18, 19.) On November 13, 2017 and December 18, 2017, the Court held a non-jury trial during which the Court heard testimony from Sylvie Pomicter, Chris DeRose, president of Last Chance for Animals, and Brian Sipe, the general manager of the Arena. In addition, the parties stipulated that the evidence that was received at the preliminary injunction hearing was part of the trial record. (Doc. 42 at 11.) Upon review of all testimony and evidence of record, the Court concluded that Defendants' leafletting restriction, voice amplification ban, and profanity or vulgarity ban, as reflected in the Revised Protest Policy, violate the First Amendment principles set forth by Supreme Court case law. (Doc. 59.) Accordingly, on April 19, 2018, judgment was entered in favor of Plaintiffs and against Defendants. (Doc. 60.)

On May 2, 2018, Plaintiffs filed a motion for additional findings of fact and law to amend the judgment to include Plaintiffs' right to carry signs outside the designated areas in addition to the Court's previous finding that Plaintiffs had the right to leaflet outside those areas. (Doc. 66.) The Court so found in its May 22, 2018, Supplemental Memorandum Opinion. (Doc. 70.) With the Amended Judgment and Order of May 22, 2018, the Court, in relevant part, enjoined and restrained Defendants "from confining protesters who are distributing literature and/or displaying signage to barricaded protest areas and thereby preventing them from distributing literature, displaying signage, and/or speaking with Arena patrons in the open spaces outside the Mohegan Sun Arena." (Doc. 71 ¶ 1.)

Defendants filed their notice of appeal on June 20, 2018, (Doc. 72). The Circuit Court issued its opinion on September 23, 2019, affirming this Court's determination that the ban on use of profane or vulgar language in the Arena's concourse by protesters violates protesters' free speech rights and the policy banning all artificial voice amplification in the Arena's concourse is an unreasonable restriction of free speech. *Pomicter*, 939 F.3d at 546-47, 548, 549. As noted above, the Circuit Court reversed this Court's determination that the policy sequestering protesters to designated areas is unreasonable, finding instead that the Arena's location condition is reasonable. *Id.* at 544, 548-49. Because this Court did not separately address the constitutionality of the Arena's policy of sequestering protesters under the Pennsylvania Constitution, the Circuit Court remanded the matter to this Court for consideration of the issue. *Id.* at 549. The parties have agreed

that the record relied upon by the Court in reaching its initial judgment is sufficient for

determining whether Defendants' policy violates the Pennsylvania Constitution.  (Doc. 83 at

5.)

## III. ANALYSIS

Plaintiffs maintain that, because the Pennsylvania Constitution provides broader

protection than the First Amendment of the United States Constitution and calls for a higher

level of scrutiny, Article I, Section 7 of the Pennsylvania Constitution prohibits Defendants'

policy of confining protesters.  (Doc. 83 at 13.)   Defendants dispute Plaintiffs' conclusion,

asserting that Defendants' restrictions on expressive activity on its sidewalk are

constitutional under the Pennsylvania Constitution.  (Doc. 86 at 7.)

As a framework for discussion of the issue of whether the Pennsylvania Constitution

provides greater protection for the speech at issue than the United States Constitution, the

parties have agreed that Defendant's practices and policies are content and viewpoint

neutral and that the Arena area at issue is a nonpublic forum.  (*See* Doc. 18 at 12 n.6.)  The

restrictions at issue have consistently been considered time, place, and manner restrictions.

*See Pomicter*, 939 F.3d at 538-41; *see also* Doc. 59 ¶¶ 8, 11.

Plaintiffs urge the Court to adopt a more rigorous standard than that used by the

Circuit Court in assessing the Arena's restrictions.  (Doc. 83 at 13-14 (citing *Pomicter*, 939

F.3d at 541).)  The Circuit Court explained the standard applicable to Plaintiffs' First

Amendment challenge:  "the government may reserve a nonpublic forum 'for its intended

purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Pomicter*, 939 F.3d at 540 (quoting *Cornelius v. NAACP Legal Defense Fund, Inc.*, 473 U.S. 788, 799–800 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)). *Pomicter* further explained that the government must provide a legitimate explanation for the restrictions in light of the purpose of the forum and surrounding circumstances, a "legitimate" explanation must be supported by record evidence or "commonsense inferences" derived therefrom, and the restrictions need not be "narrowly tailored." 939 F.3d at 541. On the last point, the Circuit Court quoted *United States v. Kokinda*, 497 U.S. 720, 735-36 (1990): "Even if more narrowly tailored regulations could be promulgated, the government is only required to adopt *reasonable* regulations, not 'the most reasonable or the only reasonable' regulation possible." 939 F.3d at 541.

Rather than applying a reasonability standard in this case, Plaintiffs maintain that "the Pennsylvania Supreme Court has repeatedly and consistently refused to permit a governmental limitation on the 'invaluable right' of 'free communication' to stand if there are less intrusive, practicable methods available to protect legitimate government interests." (Doc. 83 at 14.) Plaintiffs further maintain that "Defendants' policy of prohibiting protesters to move freely about the sidewalks outside the Arena cannot stand because of this Court's

findings that there are "less intrusive, practicable methods available' to protect the interests Defendants' claim." (*Id.*)[2]

Article 1, Section 7 of the Pennsylvania Constitution provides in relevant part that "the free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." The Supreme Court of Pennsylvania has explained that the history of this provision in Pennsylvania "is deep and the protections afforded freedom of expression by that provision longstanding: 'The protections afforded by Article I, § 7 thus are distinct and firmly rooted in Pennsylvania history and experience. The provision is an ancestor, not a stepchild, of the First Amendment.'" *DePaul v. Commonwealth of Pennsylvania*, 969 A.2d 536, 546 (Pa. 2009) (quoting *Pap's A.M. v. City of Erie*, 812 A.2d 591, 605 (Pa. 2002) ("*Pap's II*")). However, "reference to First Amendment authority remains instructive in construing Article 1, Section 7." *DePaul,* 969 A.2d at 547.

The Pennsylvania Supreme Court further explained that it

---

[2] Pursuant to *Commonwealth v. Edmunds,* 586 A.2d 887 (Pa. 1991), advocates are directed

to brief and analyze the following four factors when litigating a claim that state constitutional doctrine should depart from the applicable federal standard: (1) the text of the provision of the Pennsylvania Constitution; (2) the history of the provision, including the caselaw of this Commonwealth; (3) relevant caselaw from other jurisdictions; and (4) policy considerations, "including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence."

*Commonwealth v. Sam,* 952 A.2d 565, 585 (2008) (quoting *Edmunds,* 586 A.2d at 895). This is a burden placed on the litigants, not on the court, and the reviewing court is not required to address each factor. *Commonwealth v. Russo,* 934 A.2d 1199, 1218 (Pa. 2007).

has found that Article I, Section 7 provides broader protections of expression than the related First Amendment guarantee in a number of different contexts. *See* [*Pap's II*, 812 A.2d at 611-12] *A.M. v. City of Erie*, 812 A.2d 591, 611-12 (Pa. 2002) ("*Pap's II*") (nude dancing entitled to greater protection under Pennsylvania Constitution); *Commonwealth, Bureau of Prof'l & Occupational Affairs v. State Bd. of Physical Therapy*, 556 Pa. 268, 728 A.2d 340, 343–44 (1999) (commercial speech in form of advertising by chiropractors entitled to greater protection so long as not misleading); *Ins. Adjustment Bureau v. Ins. Comm'r*, 518 Pa. 210, 542 A.2d 1317, 1324 (1988) (Article I, Section 7 does not allow prior restraint or other restriction of commercial speech by governmental agency where legitimate, important interests of government may be accomplished in less intrusive manner); *Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382, 1391 (1981) (political leafleting on college campus deemed protected expression under Article I, Section 7 where First Amendment may not protect same); *Goldman Theatres v. Dana*, 405 Pa. 83, 173 A.2d 59, 64 (1961), *cert. denied*, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961) (statute providing for censorship of motion pictures, while not necessarily violative of First Amendment, violates Article I, Section 7).

*DePaul*, 969 A.2d at 589-90. *DePaul* also approvingly reiterated consideration of Article 1,

Section 7 set out in *Pap's II*:

*Pap's II* also made clear that, when protected expression is at issue, strict scrutiny is the appropriate measure of a governmental restriction:

We also independently hold, pursuant to Article I, § 7, that an intermediate level of scrutiny, such as is set forth in [*United States v.*] *O'Brien*, [391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)], is inappropriate where expressive conduct such as the nude dancing at issue here is involved. Our experience in this case convinces us of the wisdom of our observations in *Insurance Adjustment Bureau* [*v. Insurance Commissioner*, 518 Pa. 210, 542 A.2d 1317 (Pa.1988),] of the perils in the intermediate scrutiny test when protected expression is at issue. We conclude that regulations aimed at barring nude dancing, no less than regulations of protected commercial speech, require that we "tread carefully where restraints are imposed . . . if there are less intrusive, practicable methods available to effect legitimate, important government interests." 542 A.2d at 1324. Although the expression at issue here is not political speech (as it is

8

not in the commercial speech arena), nevertheless we are satisfied that it is communication within the contemplation of Article I, § 7. It is hardly onerous to require that a regulation that would seek to govern such expression, offered in a closed establishment to consenting adult patrons, be accomplished by a narrower, less intrusive method than the total ban on expression adopted here.

*Id.* at 612; *see also In re Condemnation by Urban Redevelopment Auth. of Pittsburgh,* 590 Pa. 431, 913 A.2d 178, 189 (2006) ("The *Pap's II* court decreed that whenever the government acts to effect such a complete ban on a certain type of expression, strict scrutiny must be applied regardless of whether the government's action was content-based.").

*DePaul,* 969 A.2d at 546–47. *In re Condemnation by Urban Redevelopment Auth. of Pittsburgh* explained the Court's alternative rationales for its holding in *Pap's II*:

this court determined that the Erie ordinance ran afoul of our Commonwealth's constitutional free expression provision. *Pap's II, supra.* The *Pap's II* court stated that for purposes of examining the state constitutional law claim, it was adopting the analysis of *Pap's I* with regard to whether the ordinance was content-based. Thus, the *Pap's II* court held that as one "obvious purpose" for the ordinance was suppressing the erotic message of nude dancing, the ordinance was content-based. *Pap's II,* 812 A.2d at 612. It thus applied the strict scrutiny test, which it also denominated the "least intrusive means analysis", *id.,* and found that the ordinance did not pass constitutional muster.

The *Pap's II* court offered an additional rationale for its holding. It noted that Erie's ordinance worked a complete bar against nude, erotic dancing. The *Pap's II* court decreed that whenever the government acts to effect such a complete ban on a certain type of expression, strict scrutiny must be applied regardless of whether the government's action was content-based.

*In re Condemnation by Urb. Redevelopment Auth. of Pittsburgh*, 913 A.2d at 188–89.

In *DePaul,* the Court noted that the Commonwealth did not dispute that strict scrutiny was the appropriate test and there was no need to consider the factors which, pursuant to

*Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991), are to be analyzed when a

litigant makes a claim that "state constitutional doctrine should depart from the applicable federal standard." *DePaul*, 969 A.2d at 541. *DePaul* ultimately held that the Race Horse and Gaming Act's complete ban on political contributions violated Article 1, Section 7 of the Pennsylvania Constitution. *Id.* at 554.

Based on the foregoing authority, the Court accepts that, pursuant to Article 1, Section 7 of the Pennsylvania Constitution, the strict scrutiny standard has, in some instances, been more broadly applied than in the federal context. However, the Pennsylvania Supreme Court in *S.B. v. S.S.*, 243 A.3d 90 (Pa. 2020), *cert. denied sub nom. S. S., ET AL. v. S. B.*, No. 20-1627, 2021 WL 4509036 (U.S. Oct. 4, 2021), applied *O'Brien's* intermediate scrutiny test when considering a content-neutral restriction on speech under federal jurisprudence and concluded that Article 1, Section 7 did not require a heightened constitutional standard in the context at issue. *Id.* at 106-13.

> Appellants have offered no meaningful argument or authority, and this Court has found none, suggesting that Article I, Section 7 requires the application of a heightened constitutional standard to a content-neutral restriction on a parent's free speech rights, as exercised during a custody proceeding where the trial court has made a specific finding that the speech harms the child's right to psychological and emotional well-being and privacy. As Appellants have failed to persuade us to the contrary, we conclude that the protections afforded by the First Amendment and Article I, Section 7 are coextensive as it relates to the particular circumstances presented by this appeal.
>
> Accordingly, for the reasons set forth in our discussion of the First Amendment in which we examined the gag order's content-neutral restrictions pursuant to the intermediate constitutional standard and balanced the competing interests of Appellants and Child, we respectfully find no merit to Appellants' contention under our state charter.

*S.B. v. S.S.*, 243 A.3d at 112–13.

From *S.B. v. S.S.*, the Court gleans that the Pennsylvania Supreme Court does not necessarily and uniformly apply the strict scrutiny standard to content-neutral restrictions under the Pennsylvania Constitution. Thus, Plaintiffs' assertion that a unitary standard (strict scrutiny) necessarily applies to all expression under Article 1, Section 7 of the Pennsylvania Constitution is not supported by relevant authority.

Further, the Court finds the Pennsylvania Supreme Court's comparative assessment of the First Amendment and Article 1, Section 7 instructive: absent evidence to the contrary, the federal and state provisions are coextensive. *Id.* at 113. Applying this principle here, absent evidence to the contrary, the federal nonpublic forum standard, i.e., reasonableness, governs under the Pennsylvania Constitution.

As noted above, the parties have agreed that the Arena restrictions are content neutral. *See supra* p. 5. Plaintiffs' conclusory statement that "Defendants' policy of confining protesters to prevent them from approaching patrons is intended to inhibit the expressive character of protest as obviously as the Erie ordinance was intended to inhibit the expressive character of nude dancing" (Doc. 87 at 11) does not show otherwise. Whereas the *Pap's II* court held that because one "obvious purpose" for the ordinance was suppressing the erotic message of nude dancing and the ordinance, therefore, was content-based, 812 A.2d at 612, nude dancing was the *only* expressive conduct addressed in the ordinance and it was *completely* banned. That is not the case here--the Arena restrictions

11

are not a complete ban of protesting and the subject matter of the protest is of no moment

to the purpose or application of the restriction.  Thus, the circumstances of this case do not

provide a similar rationale for the application of strict scrutiny.

This conclusion is buttressed by the Pennsylvania Commonwealth Court's

comments regarding *Paps II* and strict scrutiny in *London v. Zoning Bd. of Philadelphia*, 173

A.3d 847 (Pa. Commw. Ct. 2017).  In *London*, the plaintiff challenged a zoning ordinance

provision on the basis that it was unconstitutional because it was both vague and overbroad

under the First Amendment and Article 1, Section 7 of the Pennsylvania Constitution.  *Id.* at

850.  The Commonwealth Court noted that the plaintiff's suggestion that the ordinance at

issue was subject to strict scrutiny analysis under *Pap's II* was incorrect.  *London,* 173 A.3d

at 850.

> In *Pap's*, strict scrutiny applied because the ordinance at issue pertained to a
> complete prohibition on nude dancing and its purpose was to suppress
> protected expression. *Pap's*, 812 A.2d at 612. Further, in *Pap's*, our Supreme
> Court noted that restrictions that, for example, limit nude entertainment to
> certain hours or require that it be dispersed throughout the city could be viewed
> as content-neutral restrictions on the time, place and manner and would not
> trigger strict scrutiny. *Id.* at 612–13. The ordinance at issue here is not a
> complete prohibition on sexually oriented businesses. Rather, it is a content-
> neutral time, place and manner regulation. *See Renton* (holding that an
> ordinance that does not ban adult theaters altogether but merely restricts their
> location is analyzed as a time, place and manner regulation). As such, it is
> subject to an intermediate level of scrutiny. *Cf. Renton* (stating inquiry for time,
> place and manner regulations is whether the ordinance is designed to serve a
> substantial governmental interest and allows for reasonable alternative
> avenues of communication). In any event, the level of scrutiny is irrelevant
> given the nature of London's challenges. The City does not need to justify the
> regulation of adult oriented business; rather, we must determine only whether

the ordinance is overbroad or vague.

*London*, 173 A.3d 847, 850 n.2.  While the level of scrutiny was not relevant in *London* and

its reference to intermediate scrutiny is not instructive here, the Commonwealth Court's

comments about the limitations of the *Paps II* holding and the context specific application of

strict scrutiny support this Court's similar limitations.

Although the Court finds that the Pennsylvania Supreme Court has not adopted a

unitary strict scrutiny standard which it would apply to this case, the question remains

whether the Pennsylvania Constitution provides greater protection than the reasonableness

standard of the First Amendment for a content-neutral time, place, and manner restriction in

a nonpublic forum.  As noted above, these provisions are properly seen as coextensive

absent evidence that the Pennsylvania Constitution would provide greater protection in the

circumstances presented here.  *S.B. v. S.S.*, 243 A.3d at 113.

The Pennsylvania Supreme Court decisions cited above did not involve government

property which the government may, under the First Amendment, reasonably reserve for its

intended purpose as is the case here.  *See, e.g., Pomicter*, 939 A.2d at 540-41.  The cited

cases did not undertake a forum analysis which was the crux of the Third Circuit's decision

on the Arena's location restriction.  *See Pomicter*, 939 A.2d at 539-41.  For example, in

applying intermediate scrutiny, *S.B. v. S.S.* relied on both *O'Brien* and *Clark v. Community*

*for Creative Non-Violence*, 468 U.S. 288 (1984), *see* 243 A.3d at 105-06, where the First

Amendment conduct occurred in public places—in *O'Brien*, David Paul O'Brien burned his

draft card in violation of federal law on the steps of the South Boston Courthouse and the demonstrators in *Community for Creative Non-Violence* challenged the prohibition against sleeping in Lafayette Park and the Mall in Washington, D.C.[3]

Here, the Third Circuit's consideration of Plaintiffs' First Amendment claim and decision in favor of Defendants on the Arena's location restriction was "guided by the forum analysis which serves 'as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes.'" 939 F.3d at 540-41 (quoting *Kokinda*, 497 U.S. at 726). "Under this framework, 'the extent to which the Government can control access depends on the nature of the relevant forum.'" *Id.* at 431 (quoting *Cornelius*, 473 U.S. at 800). *Pomicter* then set out the analyses to be undertaken in the case of a public forum and a nonpublic forum.

> On one side of the spectrum is a public forum, property that "has been traditionally open to the public for expressive activity, such as public streets and parks." *Id.* In these spaces, "the rights of the state to limit expressive activity are sharply circumscribed." *United States v. Marcavage*, 609 F.3d 264, 279 (3d Cir. 2010) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). Time, place, and manner restrictions must be content neutral and narrowly tailored, while content-based restrictions must meet the even higher bar of being the least restrictive means of achieving a compelling government interest. *Id.* In designated public forums—property "which the state has opened for use by the

---

[3] The gag order in S.B. v. S.S. prohibited the mother and her attorneys in a custody case from "speak[ing] publicly or communicat[ing] about [the] case including, but not limited to, print and broadcast media, on-line or web-based communications, or inviting the public to view existing on-line or web-based publications." 243 A.3d at 97.

public as a place for expressive activity"—restrictions on speech are examined the same way. *Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. 948.[4]

*Pomicter*, 939 F.3d at 540.

However, in the nonpublic forum context, the United States Supreme Court has determined that the standard of assessment is whether the regulation on speech is "reasonable and not an effort to suppress expression just because public officials oppose the speaker's view" and "there is no requirement that a restriction be narrowly tailored." *Id.* at 540, 546 (citations omitted).

> In nonpublic forums—government property that is not dedicated to First Amendment activity—the government has more "flexibility to craft rules limiting speech." *Minn. Voters All. v. Mansky*, —— U.S. ——, 138 S. Ct. 1876, 1885, 201 L.Ed.2d 201 (2018). Although it "does not enjoy absolute freedom from First Amendment constraints," *Kokinda*, 497 U.S. at 725, 110 S.Ct. 3115, "the government, 'no less than a private owner of property,' retains the 'power to preserve the property under its control for the use to which it is lawfully dedicated,' " *Minn. Voters All.*, 138 S. Ct. at 1885 (quoting *Adderley v. Florida*, 385 U.S. 39, 47, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966)). This is because "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id.* (quoting *Cornelius*, 473 U.S. at 799–800, 105 S.Ct. 3439). Rather, the government may reserve a nonpublic forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (quoting *Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. 948). In a nonpublic forum, speech restrictions need only be reasonable, "a much more limited review" than applied in public forums. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992).

---

[4] *Pomicter* noted that the Supreme Court has "made clear that '[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.'" 939 F.3d at 540 n.8 (quoting *Cornelius*, 473 U.S. at 802).

*Pomicter*, 939 F.3d at 540.

As set out above, the parties agree that the area in question here is a nonpublic forum. *See Pomicter*, 939 F.3d at 540. While Plaintiffs maintain that "Pennsylvania Courts simply have not adopted the distinction between public and non-public forums" (Doc. 87 at 13), their conclusory statement is not supported by argument showing that the Pennsylvania Supreme Court would apply a different standard to content-neutral time, place, and manner restrictions imposed on property owned by a government entity that was not intended for open public use such as public streets and parks.[5]

Moreover, review of the parties' submissions and the Court's independent research do not reveal any Pennsylvania Supreme Court decision which has specifically assessed an Article 1, Section 7 claim *separately* from a First Amendment claim where the policies at issue are content-neutral time, place, or manner restrictions related to government property not dedicated for public use, i.e., a nonpublic forum. However, in *Brush v. Pennsylvania State University*, 414 A.2d 48 (Pa. 1980), the Pennsylvania Supreme Court addressed a challenge by a class of canvassers and a class of residents to Pennsylvania State University's regulations claiming that the regulations impermissibly restricted freedom of

---

[5] Plaintiffs do not cite a single case in support of the assertion and they agree with Defendants that the Supreme Court's decision in *Brush* is instructive to the disposition of the issue at hand. (*See* Doc. 86 at 8-9, 12; Doc. 87 at 13-15.)

speech and assembly guaranteed by the First and Fourteenth Amendments to the United

States Constitution and Article 1, Section 7 of the Pennsylvania Constitution.

Although *Brush* did not conduct a specific forum analysis, the Pennsylvania Supreme

Court noted that "[a] place does not necessarily become a 'public forum' for purposes of the

first amendment even where members of the public are freely permitted to visit." *Id.* at 251

n.6 (quoting *Greer v. Spock*, 424 U.S. 828 (1976)).  Further, holding that "Penn State's

connection with residence hall operations supports a finding of state action," 414 A.2d at 52,

the Court found that "[h]ere, . . . we are presented with a time, place or manner regulation.

Such a regulation is constitutionally permissible if *reasonable* and in furtherance of a

substantial governmental interest." *Id.* at 53 (emphasis added) (citing *Commonwealth v.

Sterlace*, 391 A.2d 1066 (Pa. 1978); *Grayned v. City of Rockford*, 408 U.S. 104 (1972)).[6]  In

finding this to be the appropriate standard, the Court noted that "(t)he state, no less than a

private owner of property, has the power to preserve the property under its control for the

use to which it is lawfully dedicated. *Id.* at 53 n.8 (quoting *Adderly v. Florida*, 385 U.S. 39

(1966)).

*Brush's* analysis and recognition of the government's power to control its property in

the circumstances presented parallels the nonpublic forum analysis established by the

United States Supreme Court and explained in *Pomicter.*  Because *Brush* applied a

---

[6]  In applying the reasonableness standard, *Brush* did not consider whether the regulations were
narrowly tailored or whether less restrictive means were available.  *See* 414 A.2d 48.

reasonableness standard of review to the regulations Penn State imposed upon canvassers and because *Brush* distinguished the location in language consistent with First Amendment nonpublic forum jurisprudence, the Court has no basis to conclude that the Pennsylvania Constitution requires a higher standard of review of the regulations at issue here. This is so because *Brush* obviously considered the requirements of Article 1, Section 7 coextensive with the requirements of the First Amendment--the plaintiffs sought relief under both provisions and, although the Pennsylvania Supreme Court analyzed the case in First Amendment terms, it did not arrive at a different conclusion as to the State Constitution in stating that "the regulation furthers a legitimate government interest by reasonably restricting the place and manner of expression." 414 A.2d at 54.

Importantly, no intervening Pennsylvania Supreme Court decision undermines the *Brush* analysis. In other words, no post-*Brush* decision indicates that a content-neutral time, place, or manner restriction in a location not committed to public use is subject to a standard of review that differs from that applied in the First Amendment context. Thus, insofar as the protections afforded by Article 1, Section 7 of the Pennsylvania Constitution and the First Amendment were inferentially considered coextensive by the Pennsylvania Supreme Court when the regulations at issue were found to be content-neutral time, place, or manner restrictions on property not dedicated to public use, *Brush*, 414 A.2d 243, the Court is constrained by the Third Circuit's conclusion that the location restrictions in this case were reasonable under the First Amendment. *See Pomicter*, 939 F.3d at 544.

Therefore, the Court concludes that Plaintiff's Article 1, Section 7 claim fails regarding the location restrictions imposed by the Arena.

## IV. CONCLUSION

For the foregoing reasons, judgement will be entered in favor of Defendants on Plaintiffs' Pennsylvania Constitution Article 1, Section 7 claim as it relates to the location condition imposed by Arena policy.  With the disposition of this final remaining claim, the Court will also direct that this case be closed.  A separate Order is filed with this Memorandum Opinion.

Robert D. Mariani
United States District Judge